**Charles E. BARKER, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 49S00–9411–DP–1107.

Supreme Court of Indiana.

June 12, 1998.

Rehearing Denied Aug. 31, 1998.

---

Susan D. Burke, Carolyn W. Rader, Indianapolis, for Appellant.

Jeffrey A. Modisett, Attorney General, Arthur T. Perry, Deputy Attorney General, Indianapolis, for Appellee.

BOEHM, Justice.

Charles E. Barker was convicted of two counts of murder, and one count each of kidnapping, confinement, burglary, and carrying a handgun without a license. The jury recommended that he be sentenced to death and the trial court imposed the death penalty for the murders, and consecutive terms of years for the other offenses. In this direct appeal, Barker contends that reversible error occurred as a result of:

(1) admission of other crimes, wrongs, or acts under Indiana Evidence Rule 404(b);

(2) refusal of his tendered voluntary manslaughter instruction;

(3) the State's improper questioning of prospective jurors during voir dire;

(4) unconstitutionality of the Indiana death penalty statute; and

(5) failure to instruct the jury on life imprisonment without parole.

We affirm the convictions. The State concedes a new sentencing phase is required and we remand for that purpose.[1]

## Factual Background

On Friday July 30, 1993 Charles Barker checked himself into a hospital for alcohol rehabilitation treatment. As a result of pending charges arising from a prior assault on Candice Benefiel, Barker's former girlfriend and the mother of his daughter Ashley, a court order directed that Barker have no contact with Candice. Earlier that same day, despite the order, Barker had requested Candice to move in with Deanna Best, his then current wife, while he was in the hospital. He had also requested that Candice and Ashley visit him at the hospital on Saturday, Ashley's first birthday. Candice had indicated agreement to avoid a confrontation but did not intend to comply with either request. Barker was scheduled to appear in court on the following Wednesday, August 4, to respond to the underlying charges.

Barker became upset when Candice and Ashley failed to visit Barker at the hospital on Saturday and on Sunday he checked himself out. Deanna picked Barker up and was told by the doctors to keep an eye on him because he might have convulsions from his medication. According to Deanna, Barker had been "pretty suicidal" on Sunday. On Monday Barker bought a gun. He also visited a friend who worked with Candice and in the course of an otherwise ordinary conversation told him "that he wouldn't spend any time in jail and that he would take care of things." That evening, Barker loaded the gun but Deanna persuaded him to remove the clip and give her it to her. On Tuesday, however, Barker called Deanna at work demanding the clip and she told him where it was. Late Tuesday afternoon Barker went to the home of Candice's grandparents—Mr. and Mrs. Benefiel—where Candice was staying, and watched the house hoping to speak with her. Barker caught sight of Candice a few times but she did not see him. Eventually, at about 10:00 p.m. Barker walked to a nearby friend's house.

Barker left the friend's house at about 11:15 p.m. on Tuesday. Candice testified that Barker later told her that he was on his way home when a thorn fell into his eye and he "just snapped." He headed to the Benefiels' house and entered through a back door after breaking a pane of glass. Candice, who was asleep in a bedroom with Ashley, testi-

---

1. Barker made numerous other contentions of error with respect to the penalty phase. Because a new sentencing phase is required, we do not address these claims.

fied that Barker "slammed" into her bedroom with a gun in his hand and told her to grab the child and accompany him. When Candice resisted Barker dragged Candice screaming out of her bedroom and into the hallway. In this melee, the grandparents woke up and ventured into the hallway. Mr. Benefiel, naked, jumped on Barker's back. The two began to fight and drifted into the kitchen. Candice heard two gun shots. Mrs. Benefiel then took Ashley from Candice and ran to the bathroom. Barker emerged from the kitchen and bolted past Candice toward the bathroom as Candice ran to her grandparent's bedroom to get Mr. Benefiel's gun. Candice returned to the hallway with the gun intending to shoot Barker but was unable to get the gun to work. Then she saw Barker, with his head and arm inside the bathroom door, fire his weapon. Candice tried to hide in the closet of her grandparent's bedroom and heard three more gunshots and no sound of a struggle. Barker soon found her in the closet. With his gun in one hand and Ashley in the other, he ordered Candice to put her gun down and come out of the closet. Barker then "threw" Ashley at Candice and dragged both Candice and Ashley out of the house.

Barker led the pair to Deanna's manufactured home where Deanna let them in. After Barker stated that he "had just killed Candy's grandma and grandpa," Deanna wanted to leave but Barker would not allow it because, he said, she would "rat him out." All four then drove in Deanna's car to Tennessee where Barker's uncle lived. On the drive, Barker said that he hoped that the grandparents were not dead, and that he thought he had shot Mr. Benefiel in the heart. He also said "I'm in trouble; I'm going back to jail." Barker kept his gun with him during the entire trip and warned Candice and Deanna that he was prepared to shoot them if necessary.

It was daylight when the four arrived in Tennessee and stopped at a gas station where Deanna telephoned Barker's uncle and was told the grandparents were dead. Barker then talked to the uncle. At this point a police vehicle drove into the station and Barker and the others left immediately. De-

anna told Barker that they could not take him to the uncle's residence because the police would be there. She suggested that they drop him off and come back to get him later. Barker nervously agreed. They left him at the edge of a wooded area and drove back to the gas station where the police surrounded them and then quickly apprehended Barker.

Barker told the arresting officers that he had killed two people in Indiana and had forced the two women to bring him to Tennessee. After his arrest he gave a sworn statement admitting the shootings. At trial a forensic pathologist reviewed the autopsy reports on both bodies and testified that Mr. Benefiel was shot twice: once in the left arm and once, fatally, in the chest. He also testified that Mr. Benefiel suffered from "serious" emphysema of the lungs and coronary artery disease, conditions that would have made him somewhat "frail." Mrs. Benefiel died from a gunshot wound to the head.

## I.  404(b) Evidence

Barker contends that the trial court erred in admitting evidence of other crimes, wrongs, or acts under Indiana Evidence Rule 404(b) and that admission of this evidence denied Barker a fair trial. Specifically, Barker points to evidence of four incidents, each of which was introduced through Candice's testimony over Barker's objection. Candice testified that: (1) in April 1991 Barker hit Mrs. Benefiel with a wooden spatula or similar object during an argument and the police were called; (2) in January 1992 Barker hit Mrs. Benefiel with the car he was driving, the police were called, and Mrs. Benefiel was taken to the hospital by ambulance; (3) in April 1992, when Candice was six months pregnant, Barker beat her repeatedly in the face and cut her with a kitchen knife; and (4) in June 1993 Barker hit Candice several times, submerged her in the bathtub until she "blacked out," threw her and Ashley against the wall, and sexually assaulted Candice. The "no contact" order was a result of this last incident.

Rule 404(b) provides in part: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for

other purposes, such as proof of motive, intent ... or absence of mistake or accident...." The rule is designed to prevent the jury from making the "forbidden inference" that prior wrongful conduct suggests present guilt. In order for evidence of other crimes, wrongs, or acts to be admissible, the court must (1) determine that the evidence is relevant to a matter at issue other than the defendant's propensity to commit the charged act, and (2) balance the probative value of the evidence against its prejudicial effect pursuant to Rule 403. *Hicks v. State,* 690 N.E.2d 215, 221 (Ind.1997); *Thompson v. State,* 690 N.E.2d 224, 233 (Ind.1997).

■ After a hearing, the trial court admitted evidence of the four incidents to provide the jury with background knowledge of the persons involved, "so that the jury understands that Mr. Barker and the Benefiels aren't strangers." Although the precise grounds upon which the trial court admitted the evidence are unclear, we will affirm the trial court's decision if it is sustainable on any basis in the record. *Benham v. State,* 637 N.E.2d 133, 138 (Ind.1994). The State contended in both the trial court and on appeal that these acts illustrated the relationship of the parties and that these relationships are indicative of Barker's motive. Specifically, the State contends that Barker broke into the house because he wanted to persuade Candice to drop the charges that were pending against him for the second assault. Candice testified that after the first assault, Barker had convinced her not to appear as a witness and as a result the charges against him were dropped. Evidence of the two assaults on Candice is thus arguably probative of Barker's motive for the kidnapping if not the murders. But the highly prejudicial details of these assaults did not need to be admitted to explain Barker's conduct that evening. The danger of unfair prejudice posed by details that Barker cut Candice with a knife or submerged her in the bathtub was extremely high. *Cf. Thompson,* 690 N.E.2d at 233–34 (prejudicial details of a shooting offered to explain how defendant

acquired access to the murder weapon were inadmissible). Further, these details were of little or no probative value. They tend to show only that Barker is capable of violent action. The jury needed to be informed only about the pending charges and Barker's prior successful effort to dissuade Candice from proceeding in order to explain Barker's motive in kidnapping Candice. As a result, this testimony as to the details of the assaults on Candice failed the balancing test required by Rule 403.

■ The State contends that the prior assaults on Mrs. Benefiel "show the dislike existing between [Barker] and Candice's grandparents." Even assuming that these assaults are relevant to this suggested motive for the murders, they are of such low probative value as to be substantially outweighed by the danger of unfair prejudice under Rule 403. The facts show that Barker, armed with a handgun, broke into the Benefiels' home and attempted to force Candice to leave with him. Mr. Benefiel interrupted Barker's escape and paid for this act with his life. Then Barker killed Mrs. Benefiel, took Ashley from her, found Candice, and left. Against this backdrop, the evidence of Barker's past wrongful conduct toward Mrs. Benefiel is hardly probative of anything other than Barker's character. There was no issue as to Barker's identity. The two assaults against Mrs. Benefiel occurred long before the murder—twenty-eight and nineteen months respectively—and provide no insight as to why Barker entered the house that evening to kidnap Candice. From these two assaults, and from the details of the assaults on Candice, Barker emerges—rightly or wrongly—as a violent character, someone who, as the State said in oral argument to this Court, might just turn violent. A jury presented with such a brutal picture would be hard pressed to resist drawing the forbidden inference. Accordingly, it was error to admit this evidence as well.[2]

2. Although, as explained below, we hold that the error in admitting the 404(b) evidence was harmless as to the convictions, it was not harmless as to the penalty phase, where it was relevant to no issue and might very well have affected the jury's balancing of aggravating and mitigating factors. As noted, a new penalty phase is necessary for other reasons.

None of these prior acts requires reversal, however. The improper admission of evidence is harmless error when the conviction is supported by such substantial independent evidence of guilt as to satisfy the reviewing court that there is no substantial likelihood that the questioned evidence contributed to the conviction. *Wickizer v. State,* 626 N.E.2d 795, 800 (Ind.1993). At trial the State presented conclusive independent evidence that Barker committed the killings. Barker admitted to police officers at the time of his arrest and in a sworn statement that he shot the grandparents. Candice's testimony identified Barker as the shooter and reported the events of the kidnapping. In addition, the State presented evidence of forced entry into the Benefiels' home that was consistent with Barker's own account. In the face of this overwhelming evidence, there is no substantial likelihood that the erroneously admitted evidence contributed to the jury's conclusion that Barker killed both Mr. and Mrs. Benefiel.

The jury may have been instructed on reckless homicide in this case.[3] Barker contends that the 404(b) evidence had a harmful impact on the jury's decision as to Barker's precise mens rea, if not as to whether he was guilty of any crime. Specifically, he contends that the 404(b) evidence affected the jury's choice between finding "murder," which requires a "knowing" or "intentional" killing, IND.CODE § 35–42–1–1 (1993), or reckless homicide, which requires a "reckless" killing, IND.CODE § 35–42–1–5 (1993), a lesser mental state. A person engages in conduct "knowingly" if, when the person engages in the conduct, he or she is aware of a high probability that he or she is doing so. IND.CODE § 35–41–2–2(b) (1993). A person engages in conduct "recklessly" if he or she engages in the conduct in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from the acceptable standards of conduct. IND.CODE § 35–41–2–2(c) (1993). In a nutshell, Barker contends that the erroneously admitted evidence impermissibly tainted the jury's choice between knowing and reckless conduct.

We disagree. As to Mrs. Benefiel, there is no question that Barker's conduct was intentional or knowing and not reckless. Candice testified that Barker stuck his head and arm inside the bathroom and fired, and that she heard three additional shots. Mrs. Benefiel died from a gunshot wound to the head. Her body was found leaning against the inside of the bathroom door, partially obstructing entry from the outside. To fire a deadly weapon at point blank range is to be "aware of a high probability" that death will result. Accordingly, there was no "reckless" conduct here. As to Mr. Benefiel, Candice testified that Mr. Benefiel appeared in the hallway as Barker was attempting to kidnap Candice. Mr. Benefiel, naked and unarmed, jumped on Barker and the two fought, moving into the kitchen. Candice heard two shots. The fatal shot entered Mr. Benefiel's chest, the other hit his shoulder. Mr. Benefiel was sixty-six years old, weighed 120 pounds (compared to Barker's 145), and was in "fragile" health. There was no claim of an accidental firing, and Barker acknowledged to Candice on the trip to Tennessee that he shot Mr. Benefiel in the chest and probably killed him. To support a conviction of murder, knowing killing may be inferred from a defendant's use of a deadly weapon in a manner likely to cause death. *Eads v. State,* 677 N.E.2d 524, 526 (Ind.1997); *accord Cook v. State,* 675 N.E.2d 687, 692 (Ind.1996) ("Firing three shots in the direction of the victim undoubtedly constitutes using a deadly weapon in a manner likely to cause death."). The evidence firmly supports the conclusion that at the time of the shooting, Barker was

---

**3.** We assume the instruction was in fact given though it is not clear from the record. When the trial court decided to give the reckless homicide instruction, the court designated it as Final Instruction 9C. There is no Final Instruction 9C in the record. Instead, the reckless homicide instruction appears undesignated as a Preliminary Instruction. The preliminary instructions were read to the jury at the outset of trial verbatim, except for the reckless homicide instruction. There is no verbatim record of the reading of the final instructions. Accordingly we cannot be sure that the reckless homicide instruction was part of the final instructions that were read to the jury. Reckless homicide does appear on the verdict forms, however, and is mentioned, without elaboration, as a lesser included offense of murder in Final Instruction 9B.

aware of a high probability that the conduct would result in deat 1 and accordingly that his conduct was at least knowing if not intentional.

■ To support his claim of prejudice as to the mental element of murder, Barker relies on his contention that the trial court gave a reckless homicide instruction. This fact alone, Barker argues, proves that there was a "serious evidentiary dispute" as to Barker's mens rea. *See Wright v. State,* 658 N.E.2d 563, 567 (Ind.1995) (reckless homicide instruction should be given in murder case when requested if there is a serious evidentiary dispute about the element that distinguishes the greater from the lesser offense and if, in view of this dispute, the jury could conclude that the lesser offense was committed but not the greater). In some cases, we might agree with this assertion, but not here. Barker's entire defense at trial was that he committed the killings in "sudden heat" and so should be convicted of the lesser included offense of voluntary manslaughter, which, like murder, requires a knowing or intentional killing. IND.CODE § 35–42–1–3 (1993). Accordingly, Barker requested a voluntary manslaughter instruction, which was refused. *See* Part II *infra.* But Barker did not tender a reckless homicide instruction nor did he contend at any time that his conduct was reckless. As Barker commented in his brief when arguing that the 404(b) evidence was inadmissible, "[a]t no time during the guilt phase of his trial did Mr. Barker place his intent at issue." If there was a reckless homicide instruction, the decision to give it was made sua sponte by the trial court, entirely without prompting by the parties and without any prior discussion or even mention of recklessness.[4] Barker's contention that the 404(b) evidence affected the jury's decision rests entirely on the proposition that the trial court gave a reckless homicide instruction and not on any evidence of reckless conduct or any finding by the trial

court that there was a substantial evidentiary dispute as to Barker's mens rea. We conclude that the conviction is supported by substantial independent evidence of a knowing or intentional killing and that there is no substantial likelihood that the erroneously admitted evidence contributed to the conviction. *See Wickizer,* 626 N.E.2d at 800. It was harmless error to admit the evidence.

## II. Voluntary Manslaughter Instruction

■ Barker contends it was error for the trial court to refuse his tendered voluntary manslaughter instruction. When asked to instruct the jury on a lesser included offense, the trial court is required to determine whether the lesser offense is either inherently or factually included in the crime charged. If so, then the court is required to review the evidence to assess whether there is a "serious evidentiary dispute" about the element or elements distinguishing the greater from the lesser offense. *Wright v. State,* 658 N.E.2d 563, 566–67 (Ind.1995). As we said in *Wright,* "if, in view of this dispute, a jury could conclude that the lesser offense was committed but not the greater, then it is reversible error for a trial court not to give an instruction, when requested, on the inherently or factually included lesser offense." *Id.* at 567.

■ Voluntary manslaughter is an inherently lesser included offense of murder because it requires proof of the same material elements of murder. *Id.* at 562. Like murder, it is a knowing or intentional killing, but unlike murder it is committed while acting under "sudden heat." Sudden heat is a mitigating factor and not an element of the crime. *Champlain v. State,* 681 N.E.2d 696, 702 (Ind.1997). Sudden heat has been defined as "sufficient provocation to excite in the mind of the defendant such emotions as anger, rage, sudden resentment, or terror,

---

4. Originally, Barker tendered three instructions: one each on the lesser included offenses of voluntary manslaughter and confinement, and one defining a lesser included offense. The court refused to give these instructions. Later, however, Barker asked the court to revisit its decision and presented the court with the *Wright* case. After a brief recess, the court decided that it would give

the confinement instruction, the instruction defining a lesser included offense, and a reckless homicide instruction. The court's only explanation for giving the reckless homicide instruction was that: "The *Wright* case talked specifically about 'recklessness.' And, that's why we're going to give the Recklessness."

and that such excited emotions may be sufficient to obscure the reason of an ordinary man." *Fox v. State,* 506 N.E.2d 1090, 1093 (Ind.1987). "[A]ny appreciable evidence" of sudden heat justifies an instruction on voluntary manslaughter. *Roark v. State,* 573 N.E.2d 881, 882 (Ind.1991). Here the trial court found that there was no evidence of sudden heat and declined to give the instruction. Because the court made a finding as to the existence or absence of a serious evidentiary dispute, we review its decision for an abuse of discretion. *Champlain,* 681 N.E.2d at 700.

Barker identifies as evidence of sudden heat the fact that he had slept very little in the days just prior to the killings, was having convulsions after he left the hospital, and was consuming "speed" immediately before the incidents. Barker cites Candice's failure to visit him at the hospital as upsetting and as the reason he checked himself out of the hospital and eventually broke into the Benefiels' home in search of Candice. Barker contends that this setting led to an explosion in his conduct—the sudden heat—which was triggered when Mr. Benefiel jumped on him and Mrs. Benefiel "took the baby away from Candice." This claim is wholly insufficient. The setting Barker describes is an attempt to explain Barker's state of mind generally but does not illustrate "provocation" for purposes of sudden heat. Barker's conduct provoked Mr. Benefiel to take action, not the other way around. Barker broke into the Benefiels' home bearing a weapon and was in the process of kidnapping Mr. Benefiel's granddaughter and great-granddaughter when Mr. Benefiel interrupted his escape. To fulfill his plan, Barker shot and killed both grandparents. This is not evidence of provocation to excite in Barker's mind anger, rage, sudden resentment, or terror. *Fox,* 506 N.E.2d at 1093. There was no error in refusing the voluntary manslaughter instruction.[5]

## III. Questioning of Jurors at Voir Dire

Barker next contends that the State's questioning of jurors during voir dire violated his rights to a fair trial, to an impartial jury, and to be free from cruel and unusual punishment under the Indiana and federal constitutions.[6] Specifically, he contends that the State improperly asked prospective jurors whether or not they could impose the death sentence if certain of the statutory aggravating circumstances were proved beyond a reasonable doubt. Barker says that the prosecutor's questions had the effect of obtaining a commitment from jurors to impose the death penalty if the State proved its case at the guilt phase. This contention is moot because, as explained below, a new sentencing phase is required. Barker also contends that the questions were improper under general principles of voir dire conduct. Barker does not point to any instance in the record where he objected to this questioning, and we find none. Accordingly this contention is waived. *Ingram v. State,* 547 N.E.2d 823, 829 (Ind.1989).

## IV. Constitutionality of the Death Penalty Statute

Barker contends that the use of "death qualified" juries violates the Indiana and federal constitutions unless there is (1) a judicial determination of probable cause to support the capital charge and (2) an adversarial hearing to determine the validity of the charged aggravating circumstances. Barker does not cite any authority for these propositions or develop an argument as to why his suggested procedures are required by federal due process or Indiana due course of law. Further, Barker did not object on these grounds at trial. In any event, Barker's contention boils down to a disguised challenge to the constitutionality of the prosecutor's discretion to seek the death penalty.

5. Barker cites *Roark v. State,* 573 N.E.2d 881, 882 (Ind.1991) in support of his contention. The killings in *Roark* occurred after one of the victims grabbed a knife and the defendant's young child and moved toward the defendant in a "striking manner." Unlike Barker, the defendant in *Roark* was not an intruder in the home and was not in the process of committing a crime when the "provocation" took place.

6. Specifically, Barker cites the Fifth, Sixth, Eighth, and Fourteenth Amendments of the U.S. Constitution and sections 12, 13, 16, and 18 of the Indiana Constitution.

IND.CODE § 35–50–2–9 (Supp.1994). Either a "probable cause" requirement or an adversarial hearing on the charged aggravators would place a procedural restriction on the prosecutor's discretion in seeking the death penalty. We have consistently held that the prosecutor's discretion, without these procedures in place, is constitutional.[7] *Harrison v. State*, 644 N.E.2d 1243, 1258 (Ind.1995); *Bivins v. State*, 642 N.E.2d 928, 948 (Ind. 1994). In light of this precedent, Barker's claim is without merit. We note that in *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) the United States Supreme Court held that "death qualified" juries are constitutional and do not violate a defendant's right to an impartial jury. *Cf. Matheney v. State*, 688 N.E.2d 883, 904 (Ind.1997) (failure to raise challenge to death penalty statute on ground that a finding of probable cause was required before State could use a death qualified jury was not ineffective assistance of counsel in light of *Lockhart v. McCree* ).

### V. Failure to Instruct on Life Without Parole

█ The killings in this case occurred on August 3, 1993. Public Law 250–1993 amended Indiana Code §§ 35–50–2–3 and 35–50–2–9 effective for murders committed after June 30, 1993. The amendments provided that a defendant over sixteen years of age may be sentenced to death or life imprisonment without parole. Further, at the time of the crime, if the State sought the death penalty (and now under Public Law 158–1994 if the State seeks either the death penalty or life without parole) "the court shall instruct the jury concerning the statutory penalties for murder." 1993 Ind. Acts, P.L. 250, §§ 1, 2. In this case, the jury was not instructed on life without parole as the statute required. Barker contends that this failure requires a new sentencing phase. The State agrees under the circumstances of this case, as do we.

### Conclusion

We affirm the convictions and remand for a new sentencing phase.

SHEPARD, C.J., and DICKSON, SULLIVAN and SELBY, JJ., concur.

---

7. Barker contends separately that the prosecutor's discretion to seek the death penalty under the statute even without these procedures violates the Indiana and federal constitutions. As noted above, we have consistently rejected this contention.