Joseph C. MONEGAN, Appellant (Defendant below),

v.

STATE of Indiana, Appellee (Plaintiff below).

No. 89S00–9703–CR–186.

Supreme Court of Indiana.

Dec. 30, 1999.

Douglas Norris, Cambridge City, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Suzann Weber Lupton, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

SULLIVAN, Justice.

Defendant James Monegan was convicted of murder. We affirm that conviction, finding no reversible error in either the trial court's or defense counsel's performance. But we vacate Monegan's sentence of life without parole and remand for re-sentencing to a term of years. This is because the sole "aggravating circumstance" that supported the sentence—that Monegan committed another murder—cannot be constitutionally applied where, as here, the defendant has not been convicted of the other murder.

This Court has jurisdiction over this direct appeal because the sentence exceeds 50 years. Ind. Const. art. VII; § 4; Ind. Appellate Rule 4(A)(7).

## Background

There is no factual dispute that Defendant Joseph Monegan, a juvenile, shot and killed Tyrone Deloney. The facts are in dispute, however, as to whether the killing was "accidentally" or "intentionally" executed. On June 7, 1995, Defendant and Deloney were seen arguing over money in front of an apartment building. Defendant and Deloney then walked to the back of the apartment building where, Defendant testified, they were planning to rob an individual who had taken drugs from Deloney. Defendant testified that while waiting for the individual to appear, Defendant pulled a gun out from his pocket to demonstrate how he would use the gun against the targeted individual. In his testimony, Defendant claimed that he pressed the gun to Deloney's side and clicked the trigger while holding the hammer. He then "accidentally" released the hammer, discharging the gun and shooting Deloney to death.

Immediately after hearing a gunshot, James York, who was in a nearby apartment, heard a male voice shout, "I told you not to fuck with me, mother fucker." In addition, several people saw Defendant run from the apartment building. As he fled, he pointed his gun at a woman and threatened to shoot her. Defendant took the bullets from the gun to wipe them clean and then threw the gun into a wooded area. Defendant called the police and surrendered. Defendant told the police that he had accidentally shot someone.

Shortly thereafter, Officer Steven Brown read Defendant *Miranda* rights and then Officer Brown and Juvenile Officer Michael French took Defendant into custody. While en route to the police station, Defendant asked them, "How much time do you think I'm going to get?" The facts are in dispute as to whether the officers or Defendant initiated communications after the *Miranda* warnings were given. After consulting with his mother at

the police station, Defendant requested counsel and made no other statements.

At trial, Defendant asserted the affirmative defense of accident. The trial court permitted the State to rebut this defense with evidence that Defendant had previously killed two other persons pursuant to the "intent" or "absence of mistake or accident" exceptions of Ind. Evidence Rule 404(b). On October 17, 1996, a jury found Defendant guilty of Murder.[1] The next day, the same jury recommended a sentence of life imprisonment without parole. The trial court agreed with the jury's recommendation and sentenced Defendant to life imprisonment without parole. Defendant appeals his conviction and sentence.

Additional facts will be provided as needed.

## Discussion

### I

Defendant contends that the trial court committed reversible error by admitting into evidence two prior murders allegedly committed by Defendant—one in Atlanta, Georgia, and the other in Chicago, Illinois. We agree with the State that the evidence of the Atlanta killing was properly admitted under the "intent" exception of Evid. R. 404(b), rebutting the defense of accident. We also find that although the trial court erred in admitting the evidence pertaining to the Chicago murder, the error was harmless.

### A

■ *The Killing in Atlanta, Georgia.* At trial, the court permitted the State to present the following evidence. Barbara Gipson testified that on March 25, 1995, Robert Harris was shot and killed in his home in Atlanta, Georgia. Gipson, Harris's common law wife, witnessed the kill-

ing. Gipson further testified that Defendant demanded money from her and Harris for the purpose of purchasing cocaine but neither had any money. Defendant, armed with a handgun, pressed the gun against Gipson's neck and threatened to kill Gipson if Harris did not produce the money. In attempting to save Gipson's life, Harris tried to grab Defendant but instead tripped and fell to the ground. Defendant then shot Harris, smiled, and walked away.

Barbara's daughter, Cynthia Gipson, and Cynthia's companion, Chad Carswell, heard the shot from a nearby room. Cynthia testified that she ran to where she heard the gunshot and saw Defendant exiting the room. As Defendant was leaving the room, he told Cynthia that he did not mean to shoot Harris, her step-father. Shortly after Defendant fled from the scene, Harris died from the gunshot wound.[2]

Detective Walter Mortlock investigated the Atlanta shooting. He testified that Barbara Gipson identified Defendant in a photo array as the perpetrator who killed her husband. Although Defendant was never formally charged for the murder of Harris, the State of Georgia had an outstanding warrant for his arrest.

Defendant objected to the use of the Atlanta murder evidence. He contended that it should be excluded under Evid. R. 404 on grounds that it was character evidence, offered to prove action and conformity therewith. He also argued that the evidence should be excluded under Evid. R. 403 because its probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or needless presentation of cumulative evidence.[3]

---

1. Ind.Code § 35–42–1–1 (1993).

2. At trial, Defendant denied ever killing Robert Harris but admitted that he was present at the Harris's home the day of the shooting to distribute drugs. (R. at 1014.)

3. Ind. Evidence Rule 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

On appeal, Defendant also argues that the uncharged killing of Harris and the killing of Deloney are too unrelated and remote in time to be admissible under the "intent" or "absent mistake or accident" exceptions of Evid. R. 404(b).

■■■ Indiana Evidence Rule 404(b) provides, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . ." " 'The well established rationale behind Evidence Rule 404(b) is that the jury is precluded from making the "forbidden inference" that the defendant had a criminal propensity and therefore engaged in the charged conduct.' " *Charlton v. State*, 702 N.E.2d 1045, 1050 (Ind.1998) (quoting *Thompson v. State*, 690 N.E.2d 224, 233 (Ind.1997)); *see also Hicks v. State*, 690 N.E.2d 215, 218–19 (Ind.1997). When a defendant objects to the admission of evidence on the grounds that it violates Evid. R. 404(b), we: (1) determine whether the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) balance the probative value of the evidence against its prejudicial effect pursuant to Evid. R. 403.[4] *Hicks*, 690 N.E.2d at 221. We review the relevance and balancing issues for an abuse of discretion. *See Thompson*, 690 N.E.2d at 233.

■ Evid. R. 404(b) does not authorize the general use of prior conduct evidence as proof of the general or specific intent element in criminal offenses. *See Wickizer v. State*, 626 N.E.2d 795, 799 (Ind.1993).

However, the "intent" exception contemplated in Evid. R. 404(b) may be available when a defendant goes beyond merely denying the charged culpability and affirmatively presents a claim of particularly contrary intent in opening argument, by cross-examination of State's witnesses, or by defendant's case-in-chief presentation. *Id.* In some circumstances, the State may be allowed to respond by offering evidence of prior crimes, wrongs, or acts to the extent genuinely relevant to prove the defendant's intent at the time of the charged offense. *Id.* But, as we previously held, the "intent" exception of Evid. R. 404(b) is narrowly construed. *Id.*

■ In this case, Defendant affirmatively asserted in opening argument that he accidentally shot Deloney, putting at issue the "intent" element of the homicide offense. Intent and knowledge are elements which the State must establish to prove Murder under Ind.Code § 35–42–1–1 (1993).[5] As such, extrinsic evidence that Defendant intentionally killed another person but then later claimed it was an accident was relevant to Defendant's claim that the Deloney murder was also an accident. That is, the evidence that Defendant had previously intentionally killed another but claimed that it was an accident has a tendency to make the credibility of his claim of accident in this case less probable than it would be without the evidence. *See* Evid. R. 401. This meets the test of relevance required by *Hicks* and comports with similar holdings in this and other jurisdictions. *See McEwen v. State*, 695 N.E.2d 79, 88 (Ind.1998) (finding that a defendant's prior assaults on his girlfriend were relevant to assessing the defendant's claim that he accidentally stabbed and killed his girlfriend); *Clemens v. State*, 610

---

**4.** Defendant invites us to follow a four-part test adopted by the Seventh Circuit for determining admissibility of character evidence under Evid. R. 404(b). *See United States v. Hudson*, 884 F.2d 1016, 1018–19 (7th Cir. 1989), *cert. denied*, 496 U.S. 939, 110 S.Ct. 3221, 110 L.Ed.2d 668 (1990). We have previously rejected the Seventh Circuit's formula-

tion, *Hicks v. State*, 690 N.E.2d 215, 219 (Ind.1997), and decline the invitation to revisit it here.

**5.** Murder occurs when "[a] person . . . knowingly or intentionally kills another human being." Ind.Code § 35–42–1–1(1) (1993).

N.E.2d 236, 242 (Ind.1993) (holding that evidence that a father abused one child was properly admitted to rebut his claim that accidental injuries caused another child's death pursuant to Evid. R. 404(b) absence of mistake or accident), *reh'g denied; Davidson v. State,* 558 N.E.2d 1077, 1083–84 (Ind.1990) (declaring that the defendant's previously uncharged killing of her first child to secure insurance proceeds was relevant to rebut her claim of accident regarding a similar killing of her second child); *State v. Stager,* 329 N.C. 278, 406 S.E.2d 876, 892 (1991) (holding that where a defendant was on trial for the murder of her second husband claiming "accidental" shooting, the trial court did not erroneously admit evidence of the defendant's prior killing of her first husband ten years earlier in which she also claimed "accidental" shooting); *State v. Johns,* 301 Or. 535, 725 P.2d 312, 326 (1986) (ruling that where a defendant was on trial for shooting and killing his current wife, evidence that the defendant attempted to kill his former wife six years earlier was properly admitted to rebut the defendant's defense of accident or mistake). Accordingly, we find that the extrinsic evidence of the Atlanta murder was relevant as to whether Defendant had the requisite intent to commit the killing in the present case.

In balancing the probative value of the evidence against its prejudicial effect, we observe that both the State and Defendant repeatedly informed the jury throughout the trial that the Atlanta murder and the charged murder in this case were not connected in any way. For instance, when conducting voir dire, the State expressly stated that it intended to offer such evidence to rebut Defendant's defense that he accidentally or mistakenly shot Deloney. Further, during the State's case-in-chief, the court similarly cautioned the jury to consider the evidence of the Atlanta mur-

der only on the issue of intent. The court's final instructions to the jury expressly stated that evidence of wrongful conduct or other bad acts other than the charged murder was introduced "solely on the issue of Defendant's intent, absence of mistake or absence of accident." (R. at 261.) We believe that these safeguards were sufficient to prevent the jury from drawing the "forbidden inference" that the prior wrongful conduct suggests present guilt, *Barker v. State,* 695 N.E.2d 925, 930 (Ind.1998), and more generally, that the prejudicial effect of the evidence did not outweigh its probative value.

We find that the trial court did not abuse its discretion by admitting extrinsic evidence of a prior a murder under the "intent" exception of Evid. R. 404(b).

### B

■ *The Drive-by Shooting in Chicago, Illinois.* Barbara Gipson also testified to a conversation she had with Defendant concerning an incident in Chicago. She testified that he had bragged to her that he had killed a young girl in a gang-related drive-by shooting in Chicago. Defendant contends that Evid. R. 404(b) also proscribes the admission of such evidence.[6] We agree. Unlike the evidence of the Atlanta killing, we find nothing in the Chicago story that has a tendency to make Defendant's claim of accident less probable that it would be without the evidence. *See* Evid. R. 401. Nor do we find anything else about it to have any tendency to make the existence of any fact that is of consequence to the outcome of this case more probable or less probable than it would be without the evidence. *See id.* And we believe that to the extent there was any probative value to the story, the prejudicial effect of its references to gang activity

---

**6.** On October 16, 1996, Defendant filed a motion *in limine* to prohibit the admission of the alleged Chicago shooting. The trial court conducted a hearing outside the presence of the jury, determined the evidence admissible under Evid. R. 404(b) "absent mistake or accident," and denied the motion. Defendant then made a standing objection to the admission of the alleged Chicago shooting.

and the shooting of a little girl outweighed that probative value.

■ But not all trial errors provide grounds for reversal. Error in the admission of evidence is no ground for setting aside a conviction unless such erroneous admission appears inconsistent with substantial justice or affects the substantial rights of the parties. *See* Ind. Trial Rule 61; *Fleener v. State,* 656 N.E.2d 1140, 1142 (Ind.1995).

■ In the present case, we find that the error in admitting this extrinsic evidence was harmless. First, the State presented substantial independent proof that Defendant intentionally killed Deloney: (1) Dr. John E. Pless, a forensic pathologist who examined Deloney's body, testified that the gun used to kill Deloney was pushed firmly into his stomach. (2) James York testified that, seconds after he heard a gunshot that killed Deloney, he overheard a male voice declare, "I told you not to fuck with me, mother fucker." There was substantial evidence that the declarant was the Defendant. (3) Cynthia Gipson testified that Defendant had intentionally killed another man in Atlanta while claiming it to be an accident.

Second, as noted earlier, the final instructions to the jury stated that evidence of wrongful conduct or other bad acts other than the charged murder was introduced solely on the issue of Defendant's intent, absence of mistake, or absence of accident. And third, the State did not overemphasize the limited testimony regarding the Chicago shooting. Under these circumstances, the erroneous admission of Gipson's comment about the Chicago shooting is not grounds for setting aside Defendant's conviction.

## II

We next address Defendant's assertion that he was denied his Sixth Amendment right to the effective assistance of counsel in several respects. We analyze claims of ineffective counsel according to a two-part test announced in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See State v. Moore,* 678 N.E.2d 1258, 1261 (Ind.1997) (applying *Strickland*), *cert. denied,* 523 U.S. 1079, 118 S.Ct. 1528, 140 L.Ed.2d 678 (1998); *Jackson v. State,* 683 N.E.2d 560, 562 (Ind. 1997) (same). To prevail on such a claim, a defendant must show (1) that counsel's performance fell below an objective standard of reasonableness based on prevailing professional norms, and (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Bufkin v. State,* 700 N.E.2d 1147, 1150 (Ind.1998). There is a strong presumption that counsel has rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *See Strickland,* 466 U.S. at 690, 104 S.Ct. 2052.

### A

The facts most pertinent to Defendant's first claim of ineffective assistance of counsel consist of the following. Officer Brown read Defendant *Miranda* rights at the crime scene, then he and Juvenile Officer French transported Defendant to police headquarters. Defendant testified that while en route to headquarters, one of the officers initiated a conversation by telling him, "[Y]ou know, you're going to get a lot of time," and that only then did the Defendant ask the incriminating question, "How much time do you think I'm going to get?" (R. at 994.) In contrast, Officer French's testimony suggests that it was Defendant who first spoke to the officers after the *Miranda* warnings were given.[7]

---

7. In its case-in-chief, the State questioned Officer French who provided the following testimony:

[Deputy prosecutor]: What were the first words, if any, out of [Defendant's] mouth?

### A–1

 Defendant claims that defense counsel rendered ineffective counsel by failing to request a pre-trial hearing and by failing to conduct a proper cross-examination of Officer French to determine whether an improper interrogation between Defendant and the arresting officers occurred. Once a suspect asserts *Miranda* rights to an attorney, the police must cease interrogation until counsel is present. *See Miranda v. Arizona,* 384 U.S. 436, 474, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *Rhode Island v. Innis* extends the definition of "interrogation" to words or actions made by the police officers that they should know are reasonably likely to elicit an incriminating response. 446 U.S. 291, 302, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Defendant maintains that a disputed fact remains as to *who* initiated the conversation after *Miranda* warnings were given—Defendant or the officers. Appellant's Br. at 42; Reply Br. at 17, 19–22.

Our review of the record reveals that defense counsel thoroughly cross-examined Officer French regarding the surrounding circumstances before, during, and after the discussion in the police car.[8] Under these circumstances, we will not second-guess defense counsel's decision to limit cross-examination on this issue as it involved a tactical matter of trial strategy subject to the attorney's deliberate choice. *See Hill v. State,* 442 N.E.2d 1049, 1054 (Ind.1982); *see also Osborne v. State,* 481 N.E.2d 376, 380 (Ind.1985) (observing that the nature and extent of cross-examination is a matter of strategy delegated to trial counsel). Defendant has not demonstrated that counsel's performance was unreasonable.

### A–2

 Defendant next contends that counsel rendered ineffective assistance by failing to file a motion *in limine* or motion to suppress the statement made by Defendant in the police car. In light of other steps taken in this action, we cannot agree with Defendant's contention that defense counsel's strategic decision not to file a motion *in limine* rises to the level of ineffective assistance of counsel. *See Wickliffe v. State,* 523 N.E.2d 1385, 1387 (Ind.1988) (considering all other steps taken to effectively represent the defendant, the defense counsel's tactical decision not to file motions *in limine* or motions to suppress did not constitute ineffective assistance of counsel). Defense counsel filed several other motions *in limine:* (1) to suppress an incriminating statement overheard by a State's witness, James York; (2) to exclude evidence linking Defendant to a Chicago drive-by shooting; and (3) to prohibit the admission of evidence relating to a stolen handgun that Defendant used to kill Deloney. Again, Defendant has not demonstrated that counsel's performance was unreasonable.

### A–3

 Defendant next contends that defense counsel was ineffective by failing to

---

[Officer French]: At one point he'd asked me ... what type of time am I looking at for something like this.
(R. at 615–16.)
And on re-direct examination, Officer French offered the following testimony:
[Deputy prosecutor]: [Defendant] was certainly free to talk to you though, wasn't he?
[Officer French]: Yes.
[Deputy prosecutor]: And it didn't stop him from asking you what time he was looking at, or anything like that? I mean that [*Miranda*] warning that warning that Mr. Brown gave him he still asked that question right off the bat, didn't he?
[Officer French]: Yes, shortly after we left North H.
(R. at 628.)

8. Defense counsel elicited the following information from Officer French: (1) Defendant was handcuffed and in the custody of the police, (2) after which, Defendant asked, "How much time do you think I'm going to get?," and (3) at the police station, Defendant displayed remorse by crying to his mother, expressing that he thought he took all the bullets out of the gun. In addition, defense counsel asked Defendant his own version of the facts as to the events that took place in the police car. Defendant testified that he only asked the incriminating question after the officers informed him that he would "do a lot of time."

object to the admission of Officer French's testimony regarding Defendant's question, "How much time do you think I'm going to get?" We conclude that defense counsel's decision not to object was a tactical one.

In *State v. Moore* we said that "although egregious errors may be grounds for reversal, we do not second-guess strategic decisions requiring reasonable professional judgment even if the strategy or tactic, in hindsight, did not best serve the defendant's interests." 678 N.E.2d at 1261; *see also Hunter v. State*, 578 N.E.2d 353, 356 (Ind.1991). "Counsel is afforded considerable discretion in choosing strategy and tactics, and we will accord that decision deference." *Conner v. State*, 711 N.E.2d 1238, 1248 (Ind.1999); *see also Potter v. State*, 684 N.E.2d 1127, 1133 (Ind.1997) (declaring that the reviewing court grants the trial attorney significant deference in choosing strategy, which at the time, he or she deems best under the circumstances). Strategic decisions do not constitute ineffective assistance of counsel. *See id.; Smith v. State*, 689 N.E.2d 1238, 1244 (Ind.1997).

At trial, after the questioning of Officer French as well as other officers, the trial court and counsel engaged in the following discussion outside the presence of the jury:

> The Court: . . . . I've excused the jury . . . because things are going so smoothly with so few objections. . . . [T]here has been some evidence that's been admitted to which an objection could have been made but that decision has been, *the decision not to object has been a conscious decision of defense attorney as a matter of strategy, is that correct?*
>
> [Defense Counsel]: That's correct.
>
> The Court: All right, and basically as I understand it and I'm not asking you to divulge your entire strategy . . . but essentially, you're relying on a defense that this was an accidental and unintentional circumstance as opposed to one in which the result was intended?

> [Defense Counsel]: Yes. Sir . . . .
>
> The Court: Very well, so it's not a circumstance where persons are ignoring potential objections[,] but rather as frequently happens[,] you have to decide whether you want to take some advantage by evidence going in and also in the process possibly some harm by other evidence coming in of the same nature. Is that a fair statement?
>
> [Defense Counsel]: That is correct.

(R. at 700–01.) (emphasis added)

On the witness stand, Defendant testified that the only reason he asked the incriminating question, "How much time do you think I'm going to get?," was in direct response to an "authority figure" informing him that he would get "a lot of time." (R. at 1039.) This testimony portrayed Defendant as a confused, frightened young man. On cross-examination, Defendant testified that he had fainted in the police car because he was in shock and "couldn't believe what was happening." (R. at 1040.) This testimony portrayed Defendant as being distraught over losing a friend.

Defense counsel would not have been able to use Defendant's testimony as to what occurred in the police car without allowing Officer French's testimony. While this may not have been the best strategy, we cannot say that it was unreasonable. Defense counsel's tactical decision not to object to Officer French's testimony regarding Defendant's statement did not rise to the level of ineffective assistance of counsel.

## B

Defendant contends that he was denied the effective assistance of counsel to which he was entitled when counsel did not object to the State's use at trial of a "mug shot" of Defendant. Defendant argues that the "mug shot" from his prior arrest had "no probative value and [its]

admission [into evidence] ... creat[ed] prejudice."[9] Appellant's Br. at 45. Generally, this Court has disapproved of the use of "mug shots" out of concern that jurors may infer criminal history from the photographs. *See Beadin v. State*, 533 N.E.2d 144, 146 (Ind.1989) (citing *Graves v. State*, 496 N.E.2d 383 (Ind.1986)). Here, however, the mug shot was not introduced to show Defendant's prior act of crime.

The State called to the stand Detective Mortlock who testified that he had obtained the mug shot of Defendant from the Atlanta police. The police took the photograph after Defendant committed a crime not connected with the murder of Robert Harris in Atlanta. Detective Mortlock explained that he used this photograph to help him establish Defendant's whereabouts after the Harris murder and that he used it in a photo array for Barbara Gipson and others to identify Defendant as the person who had killed Harris. Apparently, Barbara Gipson only knew Defendant as "Slim Jim" or "Ron," that is, she did not know Defendant's real name, "Joseph C. Monegan." Thus, the mug shot was relevant and necessary to explain the eventual identification of Defendant as Harris's killer. *See Byers v. State*, 709 N.E.2d 1024, 1027 (Ind.1999) (Mug shot from a prior unrelated arrest was "necessary" to establish the identity of the defendant as the killer.), *reh'g denied; see also Harrison v. State*, 707 N.E.2d 767, 778 (Ind.1999) (holding that the admission of a mug shot from the prior crime raised no substantial issue of prejudice where a detective's reference to the mug shot was used to describe a photo array), *reh'g denied.* Because the mug shot was admissi-

ble for this purpose, an objection to its use would have been overruled. As such, the failure to object did not constitute ineffective assistance of counsel.

### C

Defendant contends that he was denied the effective assistance of counsel to which he was entitled when counsel did not object to the State's use at trial of a statement made by an unknown declarant.

State witness James York testified to the following circumstances surrounding the shooting at issue in this case. York was in a second-floor apartment when he heard a gunshot coming from just below the apartment window. A few seconds after hearing a gunshot, York heard a male individual angrily say, "I told you not to fuck with me, mother fucker." (R. at 513–15.) The statement came from the same direction as the gunshot and only a couple of seconds had passed from the time the gun went off to when he heard the statement. Minutes after he heard the gunshot, York peered out his window and observed a wounded person lying on the ground, later identified as Deloney. However, York did not see Defendant. At trial, York testified that he could not identify the person who uttered the statement. York admitted that he was not acquainted with Defendant.

On October 14, 1996, Defendant filed a motion *in limine* requesting that the testimony of James York be excluded. The trial court denied the motion *in limine* on grounds that the statement was admissible under the Evid. R. 803(2) excited utterance exception,[10] and Evid. R. 803(3) declarant's then existing state of mind.[11] Counsel did

---

**9.** Defendant does not argue that the trial court erred by allowing a State's witness, Detective Mortlock, to testify about his prior arrest on an unrelated charge. Thus, we will not address the implications of Evid. R. 404(b) as it relates to this testimony.

**10.** Evid. R. 803(2) provides that a "statement relating to a startling event or condition made while the declarant was under the stress of

excitement caused by the event or condition" is not excluded by the hearsay rule.

**11.** Evid. R. 803(3) provides that a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless

not renew his objection to the admission of the statement during the direct examination of York. Appellant's Br. at 48.

Defendant contends that the statement should not have been admitted under Evid. R. 803(2) because York did not see Defendant utter the incriminating words. We agree with Defendant that the statement in question was not an excited utterance. But we find that the statement was not hearsay at all because it was not offered to prove the truth of the matter asserted. The statement was not offered as circumstantial evidence to prove that Deloney had been "fuck[ing]" with Defendant or that Defendant told Deloney not to do that. Rather, it was offered to prove that the shooting was intentional, not accidental.

Because York's testimony was not hearsay, an objection to its use at trial would have been overruled. As such, the failure to object did not constitute ineffective assistance of counsel.

#### D

Defendant contends that he was denied the effective assistance of counsel to which he was entitled when defense counsel did not object to certain statements made by the prosecutor in closing argument. He also claims that these statements amounted to prosecutorial misconduct. While referring to Defendant's prior act of killing in Atlanta, the prosecutor stated, "[I] guess he gets high off of hurting people and killing people." (R. at 1070.) At another point, the prosecutor commented, "[Defendant] was bragging about killing that little girl in Chicago because it made him feel tough. He's a killer. Don't think for one minute he's not a killer." (R. at 1060.) Defense counsel neither objected to the comments at trial nor requested admonishment.

it related to the execution, revocation, identification, or terms of declarant's will" is not excluded by the hearsay rule.

We are inclined to agree that these comments exceeded the bounds of zealous advocacy and that Defendant would have been entitled to an admonishment had he sought one. But we are also of the view that as a tactical matter, counsel could well have decided to let these brief references pass. In such circumstances, we cannot conclude that Defendant received ineffective assistance of counsel.[12]

#### E

Defendant argues that "when considered cumulatively," the claimed instances of deficient performance by counsel "greatly affected the outcome of the trial." Appellant's Br. at 39. We disagree. Having found no specific incident of ineffective assistance, we are unable to conclude that counsel's performance as a whole denied Defendant his Sixth Amendment rights.

### III

Defendant contends that the right to maintain post-arrest silence implicitly found in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 384 U.S. 436 (1966), was violated when during the State's case-in-chief, the deputy prosecutor questioned an officer about Defendant's post-arrest, post-*Miranda* silence. Defendant maintains that reversal of his conviction is required because the officer's statements were "highly prejudicial" to Defendant, and the prosecutor engaged in prosecutorial misconduct by conducting such questioning.

The United States Supreme Court has held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violates the Due Process Clause of the Fourteenth Amendment." *Doyle v. Ohio*, 426 U.S. 610, 619, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). As we must, Indiana courts follow the same rule. " 'During trial, the State may not comment upon a

12. For the same reason, we reject Defendant's claim of fundamental error on this issue.

defendant's post-arrest post-*Miranda* warning silence...'" *Miller v. State,* 702 N.E.2d 1053, 1073 (Ind.1998) (emphasis added) (quoting *Wisehart v. State,* 693 N.E.2d 23, 64 (Ind.1998), *cert. denied,* — U.S. —, 119 S.Ct. 1338, 143 L.Ed.2d 502 (1999)), *reh'g denied.*

In the present case, Officer Brown read Defendant his *Miranda* rights at the crime scene. Officer French also read Defendant his *Miranda* rights after taking him into custody. On direct examination, Officer French offered the following testimony (deputy prosecutor questioning):

Q: Did [Defendant] ever ask you how Tyrone Deloney was?

A: No, he did not.

(R. at 616.)

Q: Following his conversation with his mother, did [Defendant] give you a statement?

A: No he did not.

Q: What did he say?

A: He told me he wanted to exercise his right to have an attorney.

Q: He never told you this was a mistake, did he?

A: No, he didn't.

Q: He wouldn't tell you anything, would he?

A: No.

Q: He wanted to see an attorney.

(R. at 617–18.)

While we do not condone this line of questioning, defense counsel concedes that he did not object to these statements when they were made. (R. at 617–18, 700–01; Appellant's Br. at 35, 43). In fact, the record shows that during the cross-examination of Officer French, defense counsel himself questioned the officer about Defendant's post-arrest, post-*Miranda* silence:

[Defense Counsel]: Was there ever a time when you were present with Miss Truitt [13] when [Defendant] would have been present too?

[Officer French]: Yes.

[Defense Counsel]: Did you ever hear [Defendant] ask Miss Truitt if Tyrone [Deloney] was okay?

[Officer French]: No.

(R. at 623–24.)

Defense counsel's line of questioning was mirrored by that of the deputy prosecutor who, moments later, inquired:

[Deputy prosecutor]: Officer French, while in your presence did [Defendant] ever ask how Tyrone Deloney was?

[Officer French]: No, he did not.

(R. at 624.)

The State did not refer to the officer's statements in its opening statement or throughout the trial other than briefly in closing argument. Defense counsel did not request the trial court to admonish the jury to disregard the disputed questioning.

Given the limited nature of Officer French's testimony on Defendant's post-arrest, post-*Miranda* silence, defense counsel's decision not to object to the statements, defense counsel's own questioning on Defendant's post-*Miranda* silence, and the fact that the State did not refer to the officer's statement in opening argument,[14] we find no prosecutorial misconduct and further find that any error resulting from Officer French's testimony was harmless. In determining that the questioning regarding Defendant's post-*Miranda* silence was harmless error, we necessarily find no fundamental error.

■ Defendant also contends that he was denied the effective assistance of

---

13. At the police station, Ms. Melody Truitt, a police officer, administered a test on Defendant for gun powder residue. Ms. Truitt was present at the police station after Defendant was read *Miranda* rights by Officer Brown and Juvenile Officer French.

14. We recognize that the deputy prosecutor referred to Defendant's silence in closing argument when the prosecutor said, "[Defendant] never asked one time how [Deloney] was doing." (R. at 1064.) We believe this isolated comment was harmless.

counsel to which he was entitled when defense counsel failed to object to the questioning of Officer French's testimony on Defendant's post-arrest, post-*Miranda* silence. In finding Officer French's testimony to constitute harmless error, we cannot conclude that defense counsel's failure to object constituted deficient performance.

## IV

Upon charging Defendant with murder, the State also filed a request for a sentence of life imprisonment without parole. To obtain a sentence of life without parole, the State must prove beyond a reasonable doubt the existence of one or more aggravating circumstances listed in Ind.Code § 35–50–2–9(b). Here, the State relied on Ind.Code § 35–50–2–9(b)(8) ("(b)(8) aggravator"), which provides that it is an aggravating circumstance where "[t]he defendant has committed another murder, at any time, regardless of whether the defendant has been convicted of that other murder." *Id.* In this case, the State charged that Defendant "unlawfully and with malice aforethought, killed and murdered one Robert Harris, Jr. by shooting him with a pistol, on or about March 25, 1995, in Atlanta, Fulton County, Georgia." (R. at 22, 312.)

Defendant argues the use of the Harris murder as a (b)(8) aggravator in the penalty phase denied Defendant due process of law. Appellant's Br. at 46. Defendant further contends that defense counsel rendered ineffective assistance of counsel by failing to challenge the use of the Harris murder as a(b)(8) aggravator by not filing a motion to dismiss. *Id.* Defendant correctly cites *State v. McCormick*, 272 Ind. 272, 397 N.E.2d 276 (1979), for the proposition that the (b)(8) aggravator cannot be constitutionally employed where the defendant has not been convicted of the prior murder. *Id.* at 278–80, 397 N.E.2d at 280–81.

The State argues that *McCormick* is distinguishable from this case. *McCor-*

*mick* was an interlocutory appeal in a case in which the State sought the death penalty based on the (b)(8) aggravator. The prior murder had not been reduced to conviction and the State agreed that any evidence of it would not be admissible during the guilt phase of the trial. This Court held that it would be unconstitutional, "in essence," to try the defendant for the prior murder at the sentencing phase. *Id.* at 278, 397 N.E.2d at 280. The defendant, we said,

> would be tried on the second count to a jury which has been undeniably prejudiced by having convicted him of an unrelated murder. As the trial court pointed out in its ruling:
>
> > "Subsection (b)(8) allows the State to secure a conviction on a strong murder case, then seek the death penalty by proving a weak case before a jury which is undeniably prejudiced. This opens the door to death penalty recommendations upon a level of proof lower than proof beyond a reasonable doubt."
>
> *Id.*

We concluded our opinion in *McCormick* by saying that "our holding is confined to those cases in which the murder alleged as an aggravating circumstance is not related to the principal murder charge." *Id.* at 280, 397 N.E.2d at 281. The State argues that because the Atlanta killing was related to the principal murder charge here, *McCormick* does not control. In so arguing, the State reads "related" to mean admissible as evidence in the guilt phase. While this is a plausible reading of *McCormick* standing alone, subsequent cases make clear that the (b)(8) aggravator is only available—that is, the prior murder is only "related"—in cases in which the defendant is tried in the same proceeding for all of the murders identified in the (b)(8) aggravating circumstance charge. *See Wrinkles v. State*, 690 N.E.2d 1156, 1169 n. 24 (Ind.1997) ("[T]his aggravator is available *only* in cases in which the defendant is tried in the same proceeding for the

multiple murders alleged in the aggravating circumstances.") (emphasis added in original), *cert. denied,* — U.S. —, 119 S.Ct. 148, 142 L.Ed.2d 121 (1998); *Williams v. State,* 669 N.E.2d 1372, 1389 (Ind.1996) ("[T]his multiple murder aggravating circumstance is applicable only in cases in which the defendant is tried in the same proceeding for the multiple murders alleged in the aggravating circumstance. The aggravating circumstance of commission of another murder not reduced to conviction is unconstitutional as applied when the other murder is unrelated to the instant murder."), *cert. denied,* 520 U.S. 1232, 117 S.Ct. 1828, 137 L.Ed.2d 1034 (1997); *Hough v. State,* 560 N.E.2d 511, 518 (Ind.1990) ("[C]harging as an aggravating circumstance a separate and unrelated murder where a defendant ha[s] not been convicted of that murder violate[s] due process."), *cert. denied,* — U.S. —, 119 S.Ct. 550, 142 L.Ed.2d 457 (1998); *Davis v. State,* 477 N.E.2d 889, 893 (Ind.) (Subpart (b)(8) is considered in cases involving double or multiple murders for which the defendant is being tried in one proceeding.), *cert. denied,* 474 U.S. 1014, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985).

This Court in *McCormick* was clearly concerned about the resulting prejudice of having the jury that already convicted the defendant pass on the prior murder at the penalty phase. But our references in subsequent cases also make clear that the prior murder must be reduced to conviction. To permit otherwise, regardless of whether the prior murder is considered by the jury in the guilt phase or penalty phase, " 'opens the door to death penalty recommendations upon a level of proof lower than proof beyond a reasonable doubt.' " *McCormick,* 272 Ind. at 278, 397 N.E.2d at 280 (quoting the trial court's ruling). As this Court in *Lowery v. State* explained:

The infirmity found in the (b)(8) aggravator in *McCormick* was the basic unfairness of requiring the accused in a capital murder trial charging the killing of A to also defend against a charge of murder in the killing of B at some other time and place. The burden of marshalling witnesses and evidence for such a composite trial before the same jury would be simply staggering and the result of such a trial would be unreliable.

640 N.E.2d 1031, 1044 (Ind.1994), *cert. denied,* 516 U.S. 992, 116 S.Ct. 525, 133 L.Ed.2d 432 (1995).

In the present case, the Atlanta killing had not been reduced to conviction. Consistent with *McCormick,* we hold Defendant was denied due process when the trial court employed the (b)(8) aggravator. Accordingly, we remand this case to the trial court for re-sentencing to a term of years under Ind.Code §§ 35–38–1–7.1 (Supp. 1995) and 35–50–2–3(a) (Supp.1995; P.L. 2–1995).[15]

### *Conclusion*

We affirm the judgment of the trial court as to Defendant's conviction. However, in finding that the aggravating circumstance under Ind.Code § 35–50–2–9(b)(8) was unconstitutionally applied to Defendant in this case, we remand this case to the trial court for re-sentencing to a term of years under Ind.Code §§ 35–38–1–7.1 (Supp.1995) and 35–50–2–3(a) (Supp. 1995; P.L. 2–1995).

SHEPARD, C.J., and DICKSON, BOEHM, and RUCKER, JJ., concur.

---

**15.** The 1995 General Assembly twice amended Ind.Code § 35–50–2–3. The first amendment sets the sentence for murders committed on and after May 5, 1995, through June 30, 1995. *See* P.L. 2–1995. The second amendment sets the sentence for murders committed on and after July 1, 1995. *See* P.L. 148–1995.