

FILED
Dec 29 2016, 8:43 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

P. Jeffrey Schlesinger
Office of the Public Defender
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Katherine Modesitt Cooper
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Summer C. Snow,

*Appellant-Defendant*,

v.

State of Indiana,

*Appellee-Plaintiff.*

December 29, 2016

Court of Appeals Case No.
45A03-1605-CR-1175

Appeal from the Lake Superior
Court

The Honorable Salvador Vasquez,
Judge

Trial Court Cause No.
45G01-1412-F5-42

**Brown, Judge.**

[1] Summer C. Snow appeals her convictions for battery against a public safety official as a level 5 felony and resisting law enforcement as a level 6 felony. Snow raises one issue which we revise and restate as whether the trial court abused its discretion in admitting testimony regarding a handgun. We affirm.

## Facts and Procedural History

[2] At approximately 4:50 a.m. on November 30, 2014, Gary Police Officer Terry Peck responded to a domestic incident at a house in Gary, Indiana. When Officer Peck arrived at the house, he was met by Snow, who reported that her boyfriend, Reginald Harris, was in the back seat of her car parked on the driveway and that he refused to leave. Officer Peck asked Snow if Harris owned the car or stayed at the house, and Snow replied "no, he doesn't own the car, that it was her house." Transcript at 64. Officer Peck also asked Snow "if she had any – if he had any weapons and she stated no." *Id.* He and Snow then walked up to the car. Officer Peck opened the rear door of the car and told Harris that he needed to leave the car, Harris argued with him, Officer Peck said that if he did not leave he would be arrested for criminal trespass, and Harris still refused to exit the vehicle. Officer Peck placed his hand on Harris's arm and urged him to exit the car, and Harris grabbed Officer Peck's wrist, pulled him halfway into the car, and struck him in the face, the side of his body and head, and his arms. When Harris pulled Officer Peck into the vehicle, Snow started to shout and cheer Harris on, saying "[f]--- that white boy up," "I'm taping this s---," and "beat his a--." *Id.* at 75. Officer Peck broke free from

Harris, pulled him from the car, placed him on the ground, handcuffed him, and placed him in his police vehicle.

[3] Officer Peck then told Snow to stop shouting and to be quiet and asked for her identification, and she refused. He told Snow to return inside her house and that, if she did not, she would go to jail for disorderly conduct. Snow turned and walked towards her house while still shouting at Officer Peck, who walked to the passenger side of Snow's car to retrieve his flashlight and look for the vehicle's registration, and he heard what sounded like the front door of the house close and assumed Snow had entered her house. Officer Peck walked toward the back of Snow's car and toward his police vehicle, and Snow was back there and shouting loudly at him again. He warned Snow three times that she may be arrested for disorderly conduct, and Snow said that she "dared [his] b---- a-- to arrest her." *Id.* at 82. He ordered Snow to place her hands on the car, and she refused and started to shout "[t]hey're abusing me. Somebody tape this s---" at the top of her lungs. *Id.* He tried to grab Snow's wrists, and she pulled away from him and placed or tucked her hands underneath her sweatshirt or the light jacket she was wearing. He tried to grab her wrist and place her against her vehicle, and she swung at him.

[4] As Officer Peck struggled to control Snow, she struck him in the shoulders and side of the head, scratched his chin, and kicked him in the thigh. At one point during the altercation, Snow was able to jump on Officer Peck's back, was wrapped up around him, and started to bite his shoulder. He threw Snow off and pushed her into her car, which seemed to stun her a little bit although she

was still fighting and trying to swing, and he was able to grab hold of one of her arms and place that arm into handcuffs. At that time, Officer Peck felt an object fall and hit his knee and the top of his boot. Officer Peck initially thought it was his "flashlight or a magazine that she might have knocked off of [his] vest," that he and Snow "struggled a little bit longer," and that he "was able to finally subdue her enough to get her in handcuffs." *Id.* at 86. "She was still trying to turn and kick, but by then she was in handcuffs and she couldn't – she was just difficult to handle, but she wasn't striking [Officer Peck] anymore." *Id.* Corporal John Artibey arrived at the scene and observed Officer Peck attempting to place Snow into handcuffs, that she was pulling away at the time, and that he believed Officer Peck had one cuff on Snow. As Officer Peck placed handcuffs on Snow, Corporal Artibey walked up through the yard, and as he approached to escort her away from the vehicle he noticed a handgun on the ground where both Officer Peck and Snow were standing. Snow admitted that the gun belonged to her.

[5] The State charged Snow with two counts of battery against a public safety official as level 5 felonies, resisting law enforcement as a level 6 felony, and disorderly conduct as a class B misdemeanor.[1] Snow filed a motion *in limine* to

---

[1] In the same charging information, the State charged Harris with battery against a public safety official as a level 5 felony and resisting law enforcement as a level 6 felony. Snow and Harris were represented by the same attorney and were tried together. In a separate opinion, we affirm Harris's conviction for battery against a public safety official as a level 5 felony. *See Harris v. State*, No. 45A03-1605-CR-1168 (Ind. Ct. App. December 29, 2016).

prohibit the State from making any reference to or seeking to elicit from any witness that a weapon was found at the scene during the incident.

[6] Prior to the start of the joint jury trial, the court heard arguments on the motion *in limine* to prohibit any reference that a weapon was found at the scene. The State argued that "it is relevant that she was actually carrying a weapon on her when she was wrestling with Officer Peck" and that, "given the fact that I do believe they plan on using self-defense or some sort of defense, I think it's pertinent the gun actually shows some sort of aggression on the part of the defendant." *Id.* at 4, 7. The State further argued that "Officer Peck is going to testify that he asked Summer Snow to go inside the house and that it was under his belief that she did walk inside the house" and "[s]o it is relevant that possibly she could have went in there and got a weapon and had it on her when she was wresting [sic] with him." *Id.* at 7. In response, Snow's counsel argued that Officer Peck had no reason to believe Snow had a gun, that he was not acting the way he acted because he thought he was in fear for his life, and "[s]o his actions and the relevance and whether or not they were reasonable, the gun plays no . . . part in that determination for the jury." *Id.* at 8. The State replied that it was "not arguing that . . . it goes towards his state of mind in knowing that she had a gun," that "one of their defenses for that – any kind of scuffle between the cops could be them defending themselves from the cops is what I'm saying," and that "the fact that a gun was found shows that perhaps they were more of an aggressor rather than one of defense." *Id.* at 8-9.

The court asked "[s]o there's going to be testimony that they were aggressive," and the State responded affirmatively. *Id.* at 9. The court then asked "[a]nd your theory is that the aggressiveness on behalf of – I guess, let's say – to be clear, we're talking about Snow – is because she was – in your theory, at least – that she was trying to conceal a weapon in her possession," and the State answered: "Yes. I believe that would show more for an offensive rather than a defense position, in terms of what happened with the scuffle." *Id.* at 9-10. The court found that, "[g]iven the State's proffer," it did not believe that "the prejudicial value substantially outweighs the probative nature of the information," "particularly given the State's proffer that they believe that Snow was acting in the aggressive manner to perhaps conceal a weapon that could have been in possession." *Id.* at 10. The court further found: "A weapon that was not there at one point, certainly appears later on. I believe that the State's proffer that this is significantly probative of the defendant's action is enough no [sic] allow the information to go before the jury." *Id.* The court denied the motion *in limine* with respect to the request to prohibit any reference that a weapon was found at the scene.

During Officer Peck's trial testimony, defense counsel objected in regards to the handgun based on the arguments made during the motion *in limine*, and the court overruled the objection and stated that "the finding of the weapon is part of the entire incident and I see no reason to keep that information from the jury." *Id.* at 89-90. Officer Peck testified that he and Corporal Artibey discovered that the object that fell and hit his boot was actually a handgun.

Officer Peck testified he sustained scratches to his face and a knot on his forehead, and the court admitted photographs of Officer Peck's injuries.

[9] Snow testified that she was worked up because she saw Harris being attacked. She testified that Officer Peck asked for her identification and that she asked why he needed it and that she was the person who called the police. She testified that she turned around to retrieve her purse which was on the seat in her car, that as soon as she had turned around Officer Peck punched her in the back of the head, that he turned her around and continually punched her as she tried to block the punches, and that she was just defending herself. When asked her purpose of turning around, Snow replied to retrieve her identification located in her vehicle. She testified that she never attempted to pull a weapon out and that the weapon was in her purse on the front seat. When asked how the weapon ended up on the ground, she answered "[i]f I can guess at it, I will just say when our struggle ensued, that's when the purse hit – it probably shifted and the gun may have fell." *Id.* at 216. On cross-examination, Snow indicated that the whole purse was tipped over on the floor of her car, that everything was on the floor of the vehicle, and that the gun had fallen on the ground where she had her scuffle with Officer Peck.

[10] In closing argument, the State argued in part that the gun was never in Snow's purse, that it was in her pocket the entire time, that she lied, and that "[s]he was never on the defense. She was the aggressor the entire time." *Id.* at 356. The jury found Snow guilty of one count of battery against a public safety official as a level 5 felony and resisting law enforcement as a level 6 felony and not guilty

of the other charges. The court sentenced Snow to an aggregate term of two and one-half years with two years suspended to probation.

### *Discussion*

[11] The issue is whether the trial court abused its discretion in admitting evidence of the handgun. Generally, we review the trial court's ruling on the admission or exclusion of evidence for an abuse of discretion. *Roche v. State*, 690 N.E.2d 1115, 1134 (Ind. 1997), *reh'g denied*. We reverse only when the decision is clearly against the logic and effect of the facts and circumstances. *Joyner v. State*, 678 N.E.2d 386, 390 (Ind. 1997), *reh'g denied*. We may affirm a trial court's decision regarding the admission of evidence if it is sustainable on any basis in the record. *Barker v. State*, 695 N.E.2d 925, 930 (Ind. 1998), *reh'g denied*. Even if the trial court's decision was an abuse of discretion, we will not reverse if the admission constituted harmless error. *Fox v. State*, 717 N.E.2d 957, 966 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*.

[12] Snow argues the court abused its discretion in admitting into evidence that a gun was found at the scene when it was not used in any way nor was it related to any element of the charged offenses.[2] She argues that the gun did not tend to

---

[2] Snow was not charged with any gun-related offense. The prosecutor, during arguments on the motion *in limine*, indicated that he believed Snow was on her property, and at trial Snow testified she did not take the gun off her property that night. *See* Ind. Code § 35-47-2-1 (defining the crime of carrying a handgun without being licensed and its exceptions, including the exception that a license is not required to carry a handgun if the person carries the handgun while present in or on property that is owned or leased by the person).

prove or disprove a material fact in the case and that the prejudicial effect of the jurors being aware that a gun was present outweighed any probative value.

[13] The State responds that the trial court did not abuse its discretion in admitting evidence of the gun and that the evidence was inextricably linked to the charged crimes. The State argues that Officer Peck had assumed that Snow had gone inside, that when he later attempted to handcuff her as she fought him the gun fell on his boot, that the reasonable inference from this testimony is that Snow armed herself before she attacked Officer Peck, and that therefore the gun was not unrelated to the charged crimes. The State also argues that any error in the admission of the gun is harmless given the other evidence against her.

[14] Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action. Ind. Evidence Rule 401. The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. Ind. Evidence Rule 403. A decision concerning relevance and prejudice is within the sound discretion of the trial court, and its decision is afforded a great deal of deference on appeal. *Sandifur v. State*, 815 N.E.2d 1042, 1048 (Ind. Ct. App. 2004), *trans. denied*.

[15] While the record does not show that Snow brandished the gun when Officer Peck instructed her to place her hands on the car or in her subsequent struggle

with him, Officer Peck testified that he heard what sounded like the front door of the house close and assumed Snow had entered her house and that Snow reappeared shouting loudly at him, dared him to arrest her, and shouted "[s]omebody tape this s---" at the top of her lungs. Transcript at 82. He testified that, when he tried to grab Snow's wrists, she pulled away from him and placed or tucked her hands underneath her sweatshirt or the light jacket she was wearing; that she struck and kicked him; that Snow was able to jump on his back and was wrapped up around him; and that, at the time he was able to grab one of her arms and place that arm into handcuffs, he felt an object hit his knee and the top of his boot. He also testified that he struggled a little longer to subdue Snow and place her in handcuffs and that he discovered the object that had fallen to the ground was a gun. Corporal Artibey testified that, when he arrived at the scene, he observed Officer Peck attempting to place Snow into handcuffs, that she was pulling away at the time, and that he believed Officer Peck had one handcuff on Snow. Corporal Artibey further testified that, as Officer Peck was placing the handcuffs on Snow, he walked up through the yard and discovered the handgun on the ground where they were both standing.

[16] The testimony explained the circumstances and context of the extended verbal and physical altercations between Snow and Officer Peck. In particular, although possession of a firearm is not an element of battery on a public safety official as a level 5 felony or resisting law enforcement as a level 6 felony as

charged,[3] the inference from the testimony is that Snow had entered and exited her house, that she began to shout at Officer Peck and dared him to arrest her, and that, during this time and then at the same time that she physically struggled with Officer Peck and jumped on his back, she was in possession of and concealed a handgun. After the gun fell from her person, Snow continued to struggle with Officer Peck a little longer before he was finally able to subdue her. The fact a concealed weapon fell from Snow's person during the scuffle has at least some tendency to show, in light of the fact she had entered and exited her house and shouted at and dared Officer Peck, that Snow was acting in an aggressive manner. A defendant is not entitled to have her actions sanitized when evidence is presented to a jury. *See Reaves v. State*, 586 N.E.2d 847, 859 (Ind. 1992). On the record and circumstances before us, we cannot say the trial court abused its discretion in admitting testimony regarding Snow's possession and concealment of a gun on her person at the time she shouted at and physically struggled with Officer Peck.[4] *See Sandifur*, 815 N.E.2d at 1048-1049 (holding that evidence of the death of a person who had methadone in her

---

[3] *See* Ind. Code § 35-42-2-1 (governing the offense of battery); Ind. Code § 35-44.1-3-1 (governing the offense of resisting law enforcement).

[4] The dissent emphasizes that the State's argument on appeal is that the gun was inextricably bound up with the charged crimes and that this argument is an end-run around the Indiana Supreme Court's disapproval of the *res gestae* doctrine. However, the trial court, in its role as gatekeeper of evidence, clarified that the State's theory was that Snow "*was trying to conceal* a weapon in her possession," and the State explained its position that "that would show more for an offensive rather than defense position, *in terms of what happened with the scuffle*." Transcript at 9-10 (emphases added). We find, as explained above, that the challenged evidence is relevant.

system, although not an element of the offense of dealing in a schedule II controlled substance, was relevant).[5]

[17]     In addition, errors in the admission or exclusion of evidence are to be disregarded as harmless error unless they affect the substantial rights of the party. *Lewis v. State*, 34 N.E.3d 240, 248 (Ind. 2015). To determine whether an error in the introduction of evidence affected the party's substantial rights, we assess the probable impact of that evidence upon the jury. *Id.* The jury heard the testimony of Officer Peck and Officer Artibey regarding their encounter with Snow and Harris on November 30, 2014. Defense counsel thoroughly cross-examined the officers, and Snow testified before the jury regarding her version of the altercations with Officer Peck. The extensive testimony presented clear accounts of the actions of Snow related to resisting law enforcement and battering Officer Peck, and it is unlikely that the jury was significantly influenced by the testimony regarding the presence of Snow's gun in light of the other testimony regarding her actions. *See Lewis*, 34 N.E.3d at 248 (concluding it was unlikely that the jury was significantly swayed by further testimony that the defendant was a mean drunk on top of the other testimony it

---

[5] Snow cites to *Oldham v. State*, in which the trial court admitted evidence in Oldham's murder trial that police found a number weapons in his garage. 779 N.E.2d 1162, 1174 (Ind. Ct. App. 2002), *trans. denied*. This court observed on appeal that there was no evidence the guns belonged to Oldham or he knew the weapons were in the garage, that the clear implication was that Oldham was a dangerous criminal with a store of weapons at his disposal, and that the evidence was irrelevant and prejudicial. *Id.* at 1174-1175. Here, Snow possessed and concealed a handgun on her person while at the same time physically struggling with Officer Peck. We find *Oldham* to be distinguishable.

heard which painted a sufficiently clear picture of his temperament on the night of the crime and holding that the admission of the challenged testimony was thus not reversible error). Any error in the admission of the testimony challenged by Snow is, at most, harmless.

## *Conclusion*

[18] For the foregoing reasons, we affirm Snow's convictions.

[19] Affirmed.

Bradford, J., concurs.

Vaidik, C.J., dissents with separate opinion.

ATTORNEY FOR APPELLANT

P. Jeffrey Schlesinger
Public Defender
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Katherine Modesitt Cooper
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Summer C. Snow,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

December 29, 2016

Court of Appeals Case No.
45A03-1605-CR-1175

Appeal from the Lake Superior
Court

The Honorable Salvador Vasquez,
Judge

Trial Court Cause No.
45G01-1412-F5-42

**Vaidik, Chief Judge, dissenting.**

[20] I respectfully dissent. I do so because the fact that Snow legally possessed a handgun on her own property that she did not use or brandish during her altercation with Officer Peck was not relevant to any issue in this case. And the admission of the gun, including the State's inflammatory characterization of it as "unregistered" and "literally against the law," was not harmless error. This

case boiled down to Officer Peck's word against Snow's and the admission of the gun could have tipped the scales in favor of the State. I would therefore reverse and remand this case for a new trial.

[21] To begin, the State must prove that the handgun was relevant. Relevant evidence is evidence that tends to make more probable or less probable the existence of a fact that is of consequence in determining the action. Ind. Evidence Rule 401. The only argument of relevance that the State makes on appeal is that the gun was "inextricably bound up" with other evidence in this case. Appellee's Br. p. 15. The majority does not use this language but begins its analysis by finding that the gun was admissible because it explained "the circumstances and context" of Snow's altercation with Officer Peck. Slip op. at 11. Either of the above justifications for the admission of the gun is misplaced.

[22] Historically, Indiana allowed evidence that was "part of the story" of a particular crime, or res gestae evidence. However, in *Swanson v. State*, our Supreme Court held that res gestae should no longer be used as a way to admit evidence:

> At best, res gestae is an imprecise concept, and it has tended to be an all too easy substitute for describing the legal relevance of a particular piece of evidence. The term res gestae does not appear in our Rules of Evidence, and we believe that the admissibility of evidence is better tested by reference to the concepts found in those rules. In other words, is the evidence in question relevant in that it tends to make more probable or less probable the existence of some fact pertinent to the case? Evid. R. 401.

666 N.E.2d 397, 398 (Ind. 1996), *reh'g denied*.  The Court indicated that it "fully expect[ed] that the great majority of the evidence we formerly admitted by calling it res gestae will continue to be admitted in Indiana courts.  It will be admitted, however, by reference to the legal concepts and vocabulary of the Indiana Rules of Evidence."  *Id.* at 399.

[23]  Two years after the Supreme Court denounced res gestae as a basis to admit evidence, this Court determined that evidence was properly admitted because it was "inextricably bound up" with other evidence in the case.  *Utley v. State*, 699 N.E.2d 723 (Ind. Ct. App. 1998), *trans. denied.*  In that case, a man was charged with reckless homicide and leaving the scene of an accident after running over another man with whom he had previously been in an intimate relationship. The defendant was convicted of leaving the scene of an accident and appealed, arguing that the trial court abused its discretion in admitting evidence that he had previously been in an intimate relationship with the victim.  The defendant claimed that the evidence of their relationship revealed his sexual orientation, which was irrelevant and exposed him to the danger of unfair prejudice.  This Court, however, found that the fact that the defendant had previously been in an intimate relationship with the victim was admissible and that the defendant's sexual orientation, while not alone relevant, was "inextricably bound up" with the relevant relationship evidence:

> The former intimate nature of Utley's relationship with the victim was highly probative and relevant to explain the context of the argument which preceded the events which culminated in the victim's death and any motive Utley may have had to harm the

victim.  **That Utley's sexual preference was disclosed through this evidence was merely incidental or collateral, but "inextricably bound up" with the crime charged.**  *See State v. Lambert,* 528 A.2d [890,] 892 [(Me. 1987)] (evidence of defendant's sexual preference "inextricably bound up" with the crime alleged).

*Utley*, 699 N.E.2d at 728-29 (emphasis added).

[24]  Other panels of this Court have determined that evidence was properly admitted by using the "inextricably bound up" language from *Utley*.  For example, in *Sanders v. State*, the defendant, who was charged with child molesting, argued that the trial court abused its discretion in admitting evidence that earlier that same evening, he offered the victim and two of her friends $25 if they submitted to oral sex with him.  This Court found that this evidence was "highly probative" and "inextricably bound up" with the charged crime. *Sanders v. State*, 724 N.E.2d 1127, 1131 (Ind. Ct. App. 2000).  The fact that the defendant offered the victim $25 for oral sex is easily separable—not "inextricable"—from the fact that he molested the victim later that night.  In addition, the fact was independently relevant to show that the defendant molested the victim later that night.  *See also Sandifur v. State*, 815 N.E.2d 1042, 1048-49 (Ind. Ct. App. 2004) (finding that victim's death from methadone overdose was "inextricably bound up" with the charge against defendant for dealing methadone to her), *trans. denied*; *Willingham v. State*, 794 N.E.2d 1110, 1116 (Ind. Ct. App. 2003) (using "inextricably bound up" language to support admission of evidence that defendant sold cocaine the week before he was

arrested and charged with dealing in cocaine because it was "probative of [his] motive to sell the cocaine that the detectives found in his bedroom"); *Pope v. State*, 740 N.E.2d 1247, 1250-51 (Ind. Ct. App. 2000) (using "inextricably bound up" language to uphold admission of fact that defendant met detective posing as minor at hotel to prove child exploitation and child pornography charges that were based on facts separate from hotel meeting). To the extent these decisions relied on the "inextricably bound up" language to support admission of the evidence, the reliance was dicta because the evidence was relevant on independent grounds. Notably, our Supreme Court has never adopted "inextricably bound up" as a basis for admissibility.

[25] In my opinion, language such as "inextricably bound up" or as the majority uses—"the circumstances and context" of Snow's altercation with the officer— have become invitations to revive a defunct res gestae exception. The State accepts the invitation in this case by arguing in its brief that the sole relevance of the handgun is that it is "inextricably bound up" with other evidence in this case.

[26] As for whether the handgun is otherwise relevant in this case, the majority develops an argument of relevance that was neither argued by the State on appeal nor argued by the State at the trial-court level. Initially, the State argued at the motion in limine hearing that the gun was relevant because it showed that Snow acted in an aggressive manner because she was trying to conceal a weapon in her possession. *See* Tr. p. 9-10 ("THE COURT: And your theory is that the aggressiveness on behalf of—I guess, let's say—to be clear, we're

talking about Snow—is because she was—in your theory, at least—that she was trying to conceal a weapon in her possession? MR. MULLINS: Yes. I believe that would show more for an offensive rather than a defensive position, in terms of what happened with the scuffle."). This explanation, however, defies common sense. If Snow was trying to hide her gun, why would she attack a police officer? Moreover, as the State conceded at the motion in limine hearing and as the majority notes on appeal, Snow legally possessed the gun. *See id.* at 3; slip op. at 9 n.2. Snow had no reason to conceal it.

[27] Then at trial, the State argued that the fact that Snow possessed (but did not use or brandish) an "unregistered" gun showed that she was the initial aggressor. Tr. p. 356. Notably, there is no handgun "registration" requirement in Indiana. *See* IN.gov, *Frequently Asked Questions*, http://iot.custhelp.com/app/answers/detail/a_id/2198/kw/ISP%20Firearms (last visited Dec. 20, 2016). Snow legally possessed the handgun on her own property. I cannot say that legally possessing a handgun on one's own property, without using or brandishing it, tends to prove that the possessor is likely to have started a fight.

[28] The majority, on its own accord, finds that the gun is relevant because the fact that a concealed weapon fell from Snow during her struggle with Officer Peck has at least some tendency to show that, in light of the fact that she had entered and exited her house and dared Officer Peck to arrest her, she was the aggressor. Although the State appeared to indicate at the motion in limine hearing that there would be evidence at trial that Snow went into her house to

retrieve the gun, *see* Tr. p. 7, no such evidence was presented at trial. In fact, the State argued at trial that Snow had the gun in her pocket the "entire" time. *Id.* at 347 ("The gun was never in her purse. It was in her pocket the entire time."); *see also id.* at 355 ("It was never in the car. It was always in her pocket"). Because the evidence shows that Snow legally possessed a gun on her property that she did not use or brandish during her altercation with Officer Peck and that was not discovered until after she was handcuffed and led away from the scene, I do not believe that the gun was relevant to any fact at issue in this case. Accordingly, I believe that the trial court abused its discretion in admitting the gun into evidence.

[29] Moreover, I do not believe that the error in admitting the gun was harmless. As the State recognized during closing argument, there were "two stories" presented to the jury at trial. *Id.* at 345; *see also id.* at 361 (defense counsel: "We have two conflicting stories."). These stories were essentially told by two people: Snow and Officer Peck. Snow's theory was that Officer Peck used force against her first, that he did so unreasonably, and that she did what she had to do in order to protect herself. She supported her theory with evidence of her injuries, which required stitches and a trip to the hospital compared to the officer's injuries of a few scratches and a bump to his forehead. In contrast, the State's theory was that Snow was the aggressor and that Officer Peck only hit her in "self-defense." *Id.* at 346. As evidence of its theory, the State relied heavily on the gun, including admitting the actual gun into evidence. *Id.* at 93-94. The State argued that because Snow possessed a gun that it claimed was

**"unregistered,"** she was an aggressive person and therefore the initial aggressor in this case:

> Ms. Snow testified that she has the gun for protection. My question is, if it's for protection, why does she even have it? It's just her and her boyfriend. I'm assuming she's not taking it to the gas station because, as she said, it's **unregistered**. **It's literally against the law.** I'm assuming she doesn't want to break any law. Now, protection, when it's just her and her boyfriend in her driveway. That doesn't sound like protection.
>
> Additionally, she stated the gun is in her purse sitting on her front seat. . . . Are you going to believe that all the contents of the purse fell on the floor of the car except for one thing, the gun, which somehow fell outside of the car? . . . Does that sound reasonable? No. The gun was never in her purse. It was in her pocket the entire time. She lied. And why lie, if the gun is for protection? If all you're doing is protecting yourself, not instigating, not aggravating, why lie about the gun?
>
> * * * * *
>
> Now, one of the facts in evidence is a gun was found. A gun was found presumably having fallen out of her pocket. As we know, it wasn't in the car. It wasn't in her purse. It fell right where they were fighting, right where he was trying to defend himself and getting her under arrest. It was never in the car. It was always in her pocket.
>
> Now, why would she have it? Does that sound like someone on defense, somebody who goes in their house, . . . could have stayed in the house—but comes back yelling, shouting and carrying an **unregistered** firearm? Does that sound like someone

> that's on the defense to you?  No, no.  She was never on the
> defense.  She was the aggressor the entire time.

*Id.* at 347-48, 355-56 (emphases added).

[30]     This case essentially comes down to one person's word against another's. Because this case did not have overwhelming evidence and especially considering the State's emphasis during closing argument on Snow's "unregistered" gun, which was "literally against the law," I believe that the gun had a probable impact on the jury's decision.  I would therefore reverse Snow's convictions and remand this case for a new trial on the charges of Level 5 felony battery against a public safety official and Level 6 felony resisting law enforcement.