

**FILED**

Feb 08 2016, 8:19 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Hilary Bowe Ricks
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana

### IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Antonio Miles,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | February 8, 2016<br><br>Court of Appeals Case No.<br>32A01-1412-CR-509<br><br>Appeal from the Hendricks<br>Superior Court;<br><br>The Honorable Mark A. Smith,<br>Judge;<br><br>Trial Court Cause No.<br>32D04-1310-MR-1 |

**May, Judge.**

[1] Antonio Miles appeals his conviction of murder, a felony. He raises four issues for our consideration: (1) whether the court abused its discretion by admitting text messages he sent to the victim; (2) whether the court abused its discretion by instructing the jury that use of a deadly weapon in a way likely to cause death could support an inference that a killing occurred knowingly; (3) whether the prosecutor committed reversible misconduct in closing argument by suggesting Miles' was obliged to present evidence; and (4) whether the evidence was insufficient to support Miles' conviction.

[2] We affirm.

## Facts and Procedural History

[3] On June 8, 2013, Miles argued with Trinity Johnson, the mother of his infant daughter, in Johnson's mother's driveway. Miles was in Johnson's car, and Johnson was angrily yelling for Miles to "get the f*ck out" of the car. (Tr. at 330.) Keenan Smith, a contractor who was across the street, saw the argument. Fifteen to twenty minutes later, one of Smith's workers yelled for him to call 911. Smith ran to the house. When he entered the garage, he saw Miles next to Johnson, who was sitting against a wall. She was "gargling blood," (*id*. at 335), and making uncontrolled movements. Miles told Smith that Johnson had been "playing with the gun" and shot herself in the mouth. (*Id*. at 332.) Smith called 911. By the time police and paramedics arrived, Johnson was dead.

[4] On October 1, 2013, the State charged Miles with murder. At his jury trial, the State offered a thirty-six page exhibit of the text messages between Miles and

Johnson during the eight days before Johnson's death. (*See* State's Ex. 76.) The texts included Miles telling Johnson what kind of gun to buy for him; Miles calling Johnson a "Dumb a** b*tch," (*id*. at 8), and other names; Johnson accusing Miles of being with other women, threatening to keep their daughter from him, calling him names, and asking when he will be home to take care of their daughter; Miles apologizing for choking Johnson; Johnson telling Miles that her mother accused them of taking money from her bank account, and Miles responding that if her mother confronted him with an allegation "sh*t is gon [sic] get ugly," (*id*. at 33); and, when Miles was home with their daughter, Miles told Johnson to "Get here b4 I throw her a**," (*id*. at 36). The court ruled the text messages were admissible, and it also overruled Miles' objection to a jury instruction about when a "knowing" killing could be inferred. During the State's closing argument, the court interrupted the State to prevent discussion of a slide suggesting Miles had not presented any evidence and the court *sua sponte* instructed the jury that a defendant never has a burden to present evidence or prove anything. The jury found Miles guilty.

## Discussion and Decision

### *Sufficiency of Evidence*

[5]    When reviewing sufficiency of evidence, we consider "only the probative evidence and reasonable inferences supporting the verdict without weighing the evidence or assessing witness credibility." *Lewis v. State*, 34 N.E.3d 240, 245 (Ind. 2015). We affirm if "a reasonable trier of fact could conclude that the defendant was guilty beyond a reasonable doubt." *Id*.

[6] To convict Miles of murder, the State had to prove he knowingly killed Johnson. *See* Ind. Code § 35-42-1-1(1) (defining murder as the knowing or intentional killing of a human). There is no doubt that Johnson died of a gunshot wound to the face that was inflicted when she, Miles, and their infant daughter were the only people in the house. The only question was whether Johnson shot herself or Miles shot her.

[7] An autopsy revealed the bullet that killed Johnson entered her face just above her upper lip and to the left of her mouth. The bullet was on a downward trajectory and travelling from her left to right. After shattering her jaw it severed her spinal cord. A pathologist testified the bullet would not have changed direction after hitting her jaw. From the downward trajectory of the bullet, the pathologist opined Johnson was upright and looking forward when she was shot. Because the gun had to be above Johnson's face when it fired, the evidence does not support an inference that Johnson accidentally shot herself when she dropped the gun. Also countering Miles' explanation of the shooting is the fact that the gun did not misfire when it was struck more than 200 times with a rubber mallet in a laboratory testing.

[8] Additional laboratory testing revealed the gun produced stippling[1] up to twenty-four inches from the muzzle. By subtracting the length of the gun barrel from

---

[1] Stippling is a "puck marking" that occurs around a gunshot wound. *Wallace v. State*, 725 N.E.2d 837, 839 (Ind. 2000). The effect is produced by "unburned gun powder flakes" that exit the muzzle and land on the skin of the victim. (Tr. at 1268.)

the length of Johnson's arms, the pathologist determined that if Johnson shot herself, the gun muzzle could not have been more than fourteen inches from her face. Yet, the pathologist found no stippling on Johnson's face. Johnson did not have soot near or on the wound, nor did she have charring, burning, or searing around the wound. These facts preclude a reasonable inference that Johnson shot herself while holding the gun. (*See*, *e.g.*, Tr. at 1273) (Forensic pathologist answered, "No," when asked, "Doctor, to a reasonable degree of scientific certainty, did Trinity Johnson shoot herself?").

[9] Miles provided multiple explanations of the shooting, but in none of them was he holding the gun. He told the first person to the scene, construction-worker Smith, that Johnson "was playing with the gun, the safety was off and she shot herself in the mouth." (Tr. at 332.) The 9-1-1 operator recorded Miles giving the following explanation:

> DISPATCH: Did you find her like this or did you see this happen?
>
> [MILES]: Well, I came home and she was putting the gun up, cause she was sitting here with the gun – she was putting the gun up –
>
> DISPATCH: (Interposing) And you saw her do it?
>
> [MILES]: She was looking down the barrel like a dumba** – I – I don't even want to call her that right now (inaudible) –

(*Id*. at 338.) When the responding officer, Sergeant Brett Clark, arrived and asked what was happening, Miles again said Johnson had been "looking down the barrel of the f*cking gun." (*Id*. at 342.) A few minutes later, Sergeant Clark's body camera recorded Miles saying: "I don't know what the f*ck she was doing – she looked down the barrel of the gun and f*ck and she – I said

what the f\*ck. She had to pull the trigger. No gun goes off without the f\*cking trigger being pulled." (*Id.* at 375.) A few minutes later Miles said he heard the gunshot because "I was right here" and "saw her do the sh\*t." (*Id.* at 380.) He explained she had not put the gun in her mouth, "it was from the outside of her mouth like – like she looked down the barrel . . . ." (*Id.*)

[10] When the lead detective, Scott Larsen, arrived, Miles' story began to change. At the scene, Miles told Detective Larsen that he did not actually see the gun go off, because he had walked into the kitchen. Then, in a recorded statement given to Detective Larsen that evening at the Sheriff's Department, Miles first said he was walking the baby outside when he "heard a pop." (*Id.* at 600.) Next, he said he heard the "pop [and] turned around." (*Id.* at 601.) When asked whether he was "actually looking at her when the shot went off," (*id.* at 618), Miles said "No, I didn't – I didn't look at her when the shot went off. Well, as soon as it went off, I turned around . . . ." (*Id.*) A bit later he said he did not know how she had the gun because he was "outside." (*Id.* at 650.)

[11] Five months later when Miles was arrested, Detective Larsen told Miles that the forensic testing indicated Johnson had not been holding the gun when it was fired. Then this exchange occurred:

> [Miles]: I wasn't in the f\*cking house when the gun went off.
> [Detective]: You weren't even in the house?
> [Miles]: No, I wasn't –
> [Detective]: Okay.
> [Miles]: --even in the house when the gun went off.

[Detective]: Okay, that's not what you told me. You actually told two different stories, at least two different stories on the day that it happened and both times you were actually in the house.

[Miles]: I was not inside the house when it went off. I was putting stuff in the car for my daughter. We were going to the hospital.

(*Id*. at 674.) After Miles was booked, Detective Larsen again interviewed him:

[Detective]: . . . You've not given a plausible explanation of what happened.

[Miles]: Because I can't. I wasn't – I – I didn't see it.

[Detective]: When-

[Miles]: How will I give – I didn't see the sh*t happen.

(*Id*. at 682.)

Not only did Miles' explanation of the shooting change, he made claims that the pathologist said were impossible. On at least two occasions, Miles said Johnson talked to him after the shooting: "I said, can you breathe baby? Can you breathe? And she nodded her head, no. . . . She was talking to me for a little bit. And then she just quit talking." (*id*. at 621); "I said, are you all right? I said, can you breathe? She said, no. . . . I was just talking, trying to keep her talking." (*Id*. at 651.) The pathologist explained that after her spine was severed Johnson may have made noises as air left her lungs, but she would not have been "talking." (*Id*. at 1263.)

In light of the improbability that Johnson knowingly or intentionally shot herself and the contradictions between Miles explanations at various times, the

record contained abundant evidence to support the jury's inference that Miles knowingly killed Johnson. *See, e.g., Fry v. State*, 25 N.E.3d 237, 249 (Ind. Ct. App. 2015) (circumstantial evidence sufficient to permit jury to conclude Fry shot victim in the head), *trans. denied*.

### *Admission of Text Messages*

We review rulings on the admission of evidence for an abuse of discretion. *Pavlovich v. State*, 6 N.E.3d 969, 975 (Ind. Ct. App. 2014), *trans. denied*. An abuse of discretion occurred if the trial court misinterpreted the law or if its decision was clearly against the logic and effect of the facts and circumstances before it. *Id*.

Miles challenges the admission of text messages between him and Johnson because they "paint[ed] Miles as a disrespectful, abusive, manipulative thug, and the jury would almost certainly assume that he had acted in conformity with his reprehensible character and shot Johnson in a flash of anger . . . ." (Br. of Appellant at 16.) This argument is based on Evidence Rule 404(b), which prohibits admission of evidence to "prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."

However, Miles did not object at trial to the text messages on that basis. Rather, defense counsel explicitly stated he "didn't make the – the – the highly prejudicial 404(B) argument which I think is a much stronger argument than the argument that I made . . . ." (Tr. at 821.) Accordingly, to demonstrate he is

entitled to a reversal on the basis of Rule 404(b), Miles must demonstrate fundamental error. *See Stephenson v. State*, 29 N.E.3d 111, 121 (Ind. 2015) ("defendant may not here claim error based on grounds not asserted at trial" unless he demonstrates "fundamental error such as to override the procedural default").

> Fundamental error is an extremely narrow exception to the waiver rule where the defendant faces the heavy burden of showing that the alleged errors are so prejudicial to the defendant's rights as to "make a fair trial impossible." In evaluating the issue of fundamental error, our task is to look at the alleged misconduct in the context of all that happened and all relevant information given to the jury - including evidence admitted at trial, closing argument, and jury instructions - to determine whether the misconduct had "*such an undeniable and substantial effect on the jury's decision* that a fair trial was impossible." Fundamental error is meant to permit appellate courts "a means to correct the most egregious and blatant trial errors that otherwise would have been procedurally barred, not to provide a second bite at the apple for defense counsel . . . ."

*Jerden v. State*, 37 N.E.3d 494, 498 (Ind. Ct. App. 2015) (internal citations omitted) (emphasis in original). Miles has not met that heavy burden.

[18] Under Rule 404(b), evidence of bad acts may not be admitted to show "the person acted in accordance with the character," Evid. R. 404(b)(1), but it may be admitted to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Evid. R. 404(b)(2). The text messages demonstrate Miles and Johnson had a strained relationship and called one another names. She threatened to stop dating him and to keep their daughter from him. He threatened violence. One text included Miles' apology for choking Johnson. (State's Ex. 76 at 9.) Because

those facts about the nature of their relationship are relevant to motive and absence of mistake, they were admissible under 404(b)(2). *See Witham v. State*, --- N.E.3d ---, 2015 WL 9586984 (Ind. Ct. App. 2015) (holding court did not abuse its discretion in admitting evidence of prior hostility between victim and defendant, as hostility is a motive for violence).

[19] Even if the admission had been erroneous, the error could not be fundamental in light of the overwhelming evidence that Johnson did not shoot herself. *See Halliburton v. State*, 1 N.E.3d 670, 683 n.7 (Ind. 2013) ("Where evidence of guilt is overwhelming any error in the admission of evidence is not fundamental.").

### *Jury Instruction*

[20] "Instructing a jury is left to the sound discretion of the trial court and we review its decision only for an abuse of discretion." *Washington v. State*, 997 N.E.2d 342, 345 (Ind. 2013). We consider jury instructions in reference to each other, and we will "not reverse unless the instructions as a whole mislead the jury as to the law in the case." *Simmons v. State*, 999 N.E.2d 1005, 1011 (Ind. Ct. App. 2013), *reh'g denied*, *trans. denied*.

[21] Miles challenges a final instruction that stated: "A knowing killing may be inferred from the use of a deadly weapon in a way likely to cause death." (App. at 35.) Miles claims the language of that instruction, while correct as a matter of law, was inappropriate for a jury instruction.

[22] Miles is right that the instruction is a correct statement of the law. *See Barker v. State*, 695 N.E.2d 925, 931 (Ind. 1998) ("To support a conviction of murder,

knowing killing may be inferred from a defendant's use of a deadly weapon in a manner likely to cause death."), *reh'g denied*. Miles is also correct that not all language from judicial opinions is appropriate for jury instructions. (Appellant's Br. at 19) (citing *Gravens v. State*, 836 N.E.2d 490, 494 (Ind. Ct. App. 2005), *trans. denied*); *see also Keller v. State*, No. 88S04-1506-CR-354, slip op. at 4 (Ind. Jan. 25, 2016) (holding language from appellate opinion that emphasized certain facts was improper for jury instruction and invaded the province of the jury, requiring reversal of conviction).

[23]     However, Miles is incorrect when he asserts the language at issue was inappropriate for a jury instruction. In *Bethel v. State*, 730 N.E.2d 1242, 1246 (Ind. 2000), the trial court instructed the jury that it could "infer intent to commit murder from the use of a deadly weapon in a manner likely to cause death or great bodily injury." There was no error, "fundamental or otherwise," in the giving of that instruction. *Id*. We accordingly decline to hold any error occurred when a similar instruction was given herein.

### *Prosecutorial Misconduct*

[24]     During closing arguments, the deputy prosecutor discussed the evidence supporting the conviction and had an accompanying slide presentation. During his argument, the court interrupted and the following side bar occurred:

| | |
|---|---|
| [Court]: | . . . Have a problem with that last slide.[2] |
| [Defense]: | I was about to object to it, Judge. |
| [Court]: | The last slide (inaudible) defendant hasn't given you any-defendant's not required to give them anything. |
| [State]: | Well, (inaudible) he said . . . the gun was dropped. |
| [Court]: | (Inaudible) That's what she said in her closing; but your slide suggests that he has some burden to give them, some other alternative and obviously they don't. |

*  *  *  *  *

| | |
|---|---|
| [Court]: | (Inaudible) admonish the jury. |
| [State]: | (Inaudible) in the instructions. |
| [Defense]: | That's not enough (Inaudible)[.] |
| [Court]: | I'll remind them that the defense is not required to present evidence to prove his innocence or explain anything. |

(Tr. at 1389-90) (footnote added). The court then admonished the jury: "Folks, just as a reminder, the defendant is not required to present evidence; uh, present any evidence to prove his innocence or to prove or explain anything." (*Id.* at 1390.) The defense did not thereafter request a mistrial or additional admonition.

[25] On appeal, Miles argues the deputy prosecutor's inclusion of words on a slide suggesting Miles had a burden to explain what happened was prosecutorial

---

[2] We note that our review of this issue has been hampered by the defendant's failure to make the content of the slide part of the record at trial so that on appeal we might know what the jury may have read from the allegedly prejudicial slide.

misconduct that "denied full due process protection for Miles, entitling him to a new trial." (Br. of Appellant at 25.)

> To preserve a claim of prosecutorial misconduct, the defendant must -- at the time the alleged misconduct occurs -- request an admonishment to the jury, and if further relief is desired, move for a mistrial. Failure to do so results in waiver. Our standard of review is different where a claim of prosecutorial misconduct has been waived for a failure to preserve the claim of error. In such a case, the defendant must establish not only the grounds for prosecutorial misconduct but also that the prosecutorial misconduct constituted fundamental error.

*Jerden*, 37 N.E.3d at 498 (internal citations omitted). Miles did not move for mistrial after the trial court admonished the jury, and he therefore has a burden on appeal to demonstrate fundamental error.

[26] The trial court stopped the deputy prosecutor's presentation when it noticed the content of the slide. The deputy prosecutor did not read the slide to the jury or vocalize a suggestion that Miles had a burden to prove any fact or to prove his innocence. Nevertheless, some of the jurors may have read the content of the slide. The trial court discussed its concerns with counsel at a sidebar and then admonished the jury that Miles had no burden to prove or explain anything. The final jury instructions included this instruction regarding the presumption of innocence:

> Under the law of this State, a person charged with a crime is presumed to be innocent. To overcome the presumption of innocence, the State must prove the Defendant guilty of each element of the crime charged, beyond a reasonable doubt.
>
> The Defendant is not required to present any evidence to prove his innocence or to prove or explain anything.

(App. at 70.) In light of the jury instructions, the admonition, and the abundant evidence of guilt, Miles has not demonstrated "such an undeniable and substantial effect on the jury's decision that a fair trial was impossible." *Jerden*, 37 N.E.3d at 498; *and see id.* at 500 (in light of facts and jury instructions, no fundamental error occurred).

## Conclusion

[27] We find no reversible error in the challenged jury instruction, the admission of text messages, or the prosecutor's slide that allegedly referenced Miles' decision to not present any evidence. In light of the abundant evidence of Miles' guilt, we affirm.

[28] Affirmed.

Crone, J., and Bradford, J., concur.