

**FILED**

Oct 26 2023, 8:50 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ann M. Sutton
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General
Indianapolis, Indiana

Tyler Banks
Supervising Deputy Attorney
General
Indianapolis, Indiana

Courtney Staton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Jason Dane Brown,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

October 26, 2023

Court of Appeals Case No.
22A-CR-01241

Appeal from the Marion Superior
Court

The Honorable Mark Stoner,
Judge

Trial Court Cause No.
49D32-1708-MR-028177

**Opinion by Judge May**
Judges Weissmann and Foley concur.

**May, Judge.**

[1] Jason Dane Brown appeals his conviction of murder.[1]  He presents two issues for our review, which we expand and restate as:

> 1.  Whether Brown's right to due process was violated when the State did not preserve a blood sample collected shortly after Brown shot Lieutenant Aaron Allan;
>
> 2.  Whether the trial court abused its discretion when it admitted urinalysis results from a sample collected shortly after Brown shot Lieutenant Allan; and
>
> 3.  Whether the State presented sufficient evidence that Brown knowingly or intentionally killed Lieutenant Allan.

We affirm.

# Facts and Procedural History[2]

[2]  On July 27, 2017, at approximately 2:30 p.m., Brown and Hassan London were in a vehicle traveling at a high rate of speed on Madison Avenue in Indianapolis.  Brown, who was driving, made a sudden lane change, swerved to the right, overcorrected, and ran into the curb.  Upon impact with the curb, the vehicle bounced off the curb, slid across the road, hit the median strip between

---

[1] Ind. Code § 35-42-1-1(1).

[2] We held oral argument on this case on September 19, 2023, at Southeast Fountain Elementary School for an audience of students from Fountain Central High School, Seeger Memorial High School, and Attica High School.  We thank counsel for their able presentations, and we thank the school administration and program organizers for their hospitality.

the north and south lanes of Madison Avenue, and then started to roll. The vehicle "[e]nded up on the front lawn [of a house] upside down[.]" (Tr. Vol. VI at 126.) After the car came to a stop in the front lawn, London exited the car, seemingly uninjured, though he was "disoriented." (*Id*. at 97.) There was extensive damage to the property where the car stopped, and the property owner asked London, "what were you thinking?" to which London replied, "we were just getting high and driving fast." (*Id*. at 101-2.) The property owner noticed Brown was still in the vehicle, upside down, and suspended by his seatbelt. The property owner called 911.

[3]     Shortly after the crash, Michele Strack, a nurse passing by, approached the overturned vehicle to render aid and observed Brown suspended upside down in the vehicle. He appeared to be unconscious. Strack felt for a pulse and lifted Brown's chin to ensure he was breathing. Another nurse who was passing by at the time of the accident, Angela Cook, also stopped to help. Cook did not observe any injuries on Brown but did not move him because he may have sustained a neck injury. She noticed Brown was "reaching for things, or fidgeting with things" on the roof of the vehicle that had fallen out of his pockets. (*Id*. at 213.)

[4]     Shortly thereafter, Major Charles Bowman of the Homecroft Police Department and Lieutenant Allan of the Southport Police Department responded to a report of a car accident on Madison Avenue in Indianapolis. When they arrived, Lieutenant Allan got down on his knees and crawled toward the passenger side of the vehicle. He spoke to Brown, who was still

agitated and fidgety. Lieutenant Allan asked Brown if he knew what happened and if he knew what day it was. Brown mumbled in response and gave Lieutenant Allan his driver's license. Brown continued to move around. Lieutenant Allan asked him to stop moving around and explained that medical personnel were worried about a neck injury. Brown told Lieutenant Allan his name was "Jason." (State's Ex. 148 at 0:42.)

[5] Lieutenant Allan continued to try to calm Brown and reminded him to stay still while medical personnel were determining Brown's condition. Suddenly, Brown yelled "fuck you" and said "give me the fucking gun." (*Id*. at 1:09 - :11.) Lieutenant Allan backed out of the car and told Brown to stop. Brown again yelled profanities at Lieutenant Allan and began touching his own clothing. Lieutenant Allan looked back into the car and yelled, "he's trying to grab something out of his pocket." (*Id*. at 1:20.) Lieutenant Allan told Brown to stop. Brown pulled a firearm from the back of his waistband, lifted the firearm, and shot Lieutenant Allan until the firearm ran out of ammunition.

[6] Officer Kevin Conjelko of the Johnson County Sheriff's Department was off duty, but stopped at the scene when he passed by shortly after the accident occurred. While helping others on scene, Officer Conjelko heard gunfire. He immediately dropped to his knees, pointed his firearm at Brown, and shot six rounds in Brown's direction. Officer Conjelko returned to his vehicle, reloaded his gun, and fired two more shots toward Brown. Chief John Ryan of the Homecroft Police Department, who was also on the scene, fired two shots toward Brown as well.

[7] When the gunfire stopped, Strack observed a person "down in the grass . . . someone laying on their back." (Tr. Vol. V at 65.) She said, "we've got someone down" and officers went to the person on the ground. (*Id*.) One of the officers said, "Allan is down." (*Id*.) Officer Conjelko attempted to speak to Lieutenant Allan, who was unresponsive. Officer Conjelko then rolled Lieutenant Allan over and "just saw massive trauma everywhere." (*Id*. at 140.) He saw "multiple entry wounds, exit wounds . . . [that were] no longer bleeding." (*Id*.) Shortly thereafter, medical personnel took Lieutenant Allan to the hospital. Lieutenant Allan died later that day from gunshot wounds to his right forearm, right upper arm, right knee, right lateral chest, right lower abdomen, right buttock, central lower abdomen, left forearm, left side, and left medial thigh. The autopsy indicated the shot through the left side was likely fatal because it struck Lieutenant Allan's heart.

[8] After medical personnel removed Lieutenant Allan from the scene, Officer Christopher Hemphill of the Homecroft Police Department arrived in response to the Code One[3] radio call. He learned from another officer, who still had his gun drawn, that Brown shot Lieutenant Allan. Officer Hemphill looked inside the vehicle where he saw Brown and the gun, which had "the slide locked back."[4] (Tr. Vol. VI at 29.)

---

[3] "Code One" is a radio call that indicates "there is an officer that's down." (Tr. Vol. VI at 83.)

[4] When the slide locks back, it indicates the firearm is "empty." (Tr. Vol. VI at 30.)

[9] Officer Hemphill approached Brown, who was still hanging by his seatbelt in the overturned vehicle. He told Brown he was going to remove him from the vehicle so Brown needed to put his hands outside the car. He then told Brown "Don't move. If you move, make any sudden movements towards the gun, you're going to get shot." (*Id*.) Brown complied with Officer Hemphill's directions. Officer Hemphill cut the seatbelt. Another officer dragged Brown toward the back of the car, searched him, handcuffed him, and then allowed medics to treat him.

[10] Paramedics transported Brown in an ambulance to Eskenazi Hospital. En route, Brown began to "moan and groan and talk." (*Id*. at 62.) He was able to give paramedics his name and indicated he "knew what happened." (*Id*.) At some point after Brown arrived at the hospital, medical personnel took a blood sample and a urine sample as part of his care. Brown sustained gunshot wounds to his left forearm, right neck, right cheek, nose, and the top of his head.

[11] The Indianapolis Metropolitan Police Department assigned Detective Mark Prater to investigate the case. He immediately applied for and was granted search warrants for Brown's vehicle, the crime scene, and Brown's clothing. In the vehicle, Officer Christine Hagan of the Indianapolis Metropolitan Police Department, who was assisting Detective Prater with the investigation, found eighteen spent bullet cartridges along with a nine-millimeter handgun with the "slide . . . in the locked back position . . . [and there] was no unfired cartridge in the chamber, and the magazine was empty." (Tr. Vol. V at 212.) She also

found a "potential quart-size Ziplock [sic] baggy [sic] that contained smaller bags with possible marijuana in them" and a scale in the vehicle. (*Id.* at 211.)

[12] Detective Prater did not request a blood sample at the time of his initial investigation because "[t]here was no information that would warrant us getting a blood draw at that time." (Tr. Vol. VI at 147.) However, after consulting with the Marion County Prosecutor's Office, "the decision was made to try to obtain a blood sample" from Brown on the day of the crime. (*Id.*) On August 15, 2017, after obtaining a search warrant for Brown's blood sample, Detective Prater attempted to obtain the blood sample taken from Brown at Eskenazi Hospital shortly after the crime. A representative of Eskenazi Hospital indicated the blood sample had been destroyed, but Brown's urine sample, which was collected at about the same time, was still available. After obtaining an additional search warrant for the urine sample, Detective Prater collected the urine sample on August 15, 2017, and sent it to a laboratory for analysis. Brown's urine sample tested positive for THC; cocaine; two different types of "spice," a synthetic cannabinoid; and hydromorphone, which was likely present because of the opioid pain medication Brown was given in the hospital.

[13] On August 1, 2017, the State charged Brown with murder and Class A misdemeanor possession of marijuana.[5] On September 28, 2017, the State filed notice of its intent to pursue the death penalty. On May 24, 2021, Brown filed a

---

[5] Ind. Code § 35-48-4-11(b).

motion to exclude the results of the toxicology report. He argued toxicology results from a urinalysis are not relevant under Indiana Evidence Rule 401 "because impairment or intoxication cannot be inferred from the results of a urine screen." (App. Vol. IX at 131.) Additionally, Brown asserted the results should be excluded "because the State has failed to properly preserve the urine sample, the defense is unable to perform any of its own testing on the sample." (*Id*.) The State filed its response, and then the trial court held a hearing on Brown's motion on August 11, 2021.

[14] On December 3, 2021, Brown entered an agreement with the State in which he would waive his right to a jury trial in exchange for dismissal of the State's request for the death penalty. On January 3, 2022, the trial court denied Brown's motion to exclude the toxicology results. Brown's bench trial commenced on February 1, 2022. After the State's case in chief, Brown moved for an involuntary dismissal of the murder charge and, in the alternative, Brown asked for dismissal of the possibility of a sentence of life without parole because the State had not "proven murder or the aggravating circumstance required for the life without parole sentence request." (Tr. Vol. VII at 207.) Brown argued the State did not prove Brown acted knowingly or intentionally as required for a conviction of murder. Additionally, Brown argued that, if the trial court determined Brown committed murder, the State did not prove the aggravating circumstance that Brown "knew Lieutenant Allan was a police officer at the time of the shooting." (*Id*. at 208.)

[15] The trial court agreed the State had not proven Brown knew Lieutenant Allan was a police officer and, therefore, it dismissed the possibility of Brown receiving a sentence of life without parole. On February 22, 2022, the trial court found Brown guilty as charged. In doing so, the trial court recounted the elements of murder and acknowledged Brown's defenses thereto:

> The evidence of the shooting and the identity of the shooter is overwhelming and uncontradicted. This is not a case based on circumstantial evidence alone where the State must exclude every reasonable hypothesis of innocence. The State does not require – the law does not require the State to prove motive. It's always helpful, highly relevant but not necessary, because we know almost by definition the crime itself is an irrational act not based on logic and people commit criminal offensesfor [sic] the most illogical and even stupidest of reasons.

> [I]n similar fashion, the State does not have to prove premeditation for murder, a planned out thought for reason, because again, we [sic] know people do some of the most dangerous and violent acts within seconds without significant consideration of the likely consequences.

> This also is not a case where the State must prove the Defendant's intoxication beyond a reasonable doubt. This is not a crime, unlike operating a motor vehicle under the influence of liquor causing death, where intoxication is an element of the offense. If it were, the State's failure to obtain and preserve the Defendant's blood sample would have crippled the case. While the State has argued vigorously its theory of the case with an emphasis on the Defendant's drug use and/or the Defendant's reaction to a potential drug withdrawal, the Court is not required to accept or even agree with that premise. The elements are simple, did the Defendant knowingly kill Lieutenant Allen [sic].

The sole issue is the knowingly element. Normally, shooting at someone 18 times, hitting them 11 times would satisfy the element.

More specifically, the issue here is whether the Defendant, based on a medical condition, lacked the mens rea to be held responsible under the law. While not a statutory defense specifically delineated by the legislature like insanity, it is similar. Yes, I did this, but I am not legally responsible for it.

The defense has relied primarily on an expert witness, Dr. [Pamela] Blake, who admittedly is not an expert in the field most at issue. She is not an epileptologist. And while her knowledge of epilepsy is impressive, her actual experience with epilepsy patients is extremely limited. She changed her original theory of causation given under oath in a substantial way when she had an ample opportunity to observe the fallacy of her own conclusion and correct it.

Her second causation theory rested primarily on the truthfulness and credibility of the Defendant's passenger, Hassan London, not from his actual trial testimony but from his previous sworn and unsworn statements. This court personally observed London's testimony under oath and found him to be of all of the witnesses in this case totally unreliable, evasive, self-serving and unworthy of belief. London refused to answer the simplest of questions despite having use immunity and the benefit of appointed counsel. Dr. Blake's opinion also accepted those parts of London's statements which fit her theory of the case and ignored statements which did not, his excited utterance that we were getting high and driving fast and the Defendant previously drove fast, as London described it, like a Nascar driver. Any expert opinion based upon London's evidence is not reliable in the court's view. Dr. Blake also accepted at face value without any medical documentation or substantiation the Defendant's

family assertions that the Defendant must have had seizures before.

In addition to the defense expert's changing opinions, reliance upon a witness with little to no credibility and the acceptance of family assertions of prior seizures without documentation, the expert acknowledged her opinion is consistent with the international standards established by professionals who have the specific expertise to guide courts in this, again using the Defendant's expert's own language, rarest of cases.

The evidence is clear that Defendant's situation does not meet those standards. Although Dr. Blake has a sincere belief in her conclusions, they are not credible to the Court and are the equivalent of trying to fit a square peg into a round hole. Even if the court accepted the defense theory, which the Court after careful consideration does not, allowing the Defendant to avoid responsibility for this violent act would not be just or fair. This is not a case where the Defendant's unknown bad health condition caused him to unwillingly commit a criminal offense. Rather, the Defendant's willful choice to not seek reasonable medical care from his previous alleged head traumas so that he could avoid negative legal consequences to himself has caused him to knowingly engage in dangerous behavior or activities which ultimately seriously hurt him and caused another citizen to lose his life.

To summarize, the State has proven the elements of murder beyond a reasonable doubt based on the totality of the circumstances. The Court further finds the State has disproven the defense's contention, although rigorously and well-argued, beyond a reasonable doubt and enters judgment of conviction of Court One, murder, and Count Two, possession of marijuana.

(Tr. Vol. VIII at 211-3.) On May 6, 2022, the trial court sentenced Brown to an aggregate sentence of fifty-eight years incarcerated with three years suspended to probation.

## Discussion and Decision

### 1. Blood Sample

Brown argues the State violated his right to due process when it failed to secure Brown's blood sample taken shortly after the incident because such evidence may have been exculpatory. The Due Process Clause of the Fourteenth Amendment "guarantees criminal defendants a meaningful opportunity to present a complete defense*." Holmes v. South Carolina*, 547 U.S. 319, 326 (2006). "When the State fails to preserve materially exculpatory evidence, a due process violation occurs regardless of whether the State acted in bad faith." *Pimentel v. State*, 181 N.E.3d 474, 480 (Ind. Ct. App. 2022), *trans. denied*. Evidence is exculpatory if it clears or tends to clear the defendant from alleged fault or guilt. *Id*. "Evidence is materially exculpatory if it 'possesses an exculpatory value that was apparent before the evidence was destroyed' and must 'be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" *Id*. at 479 (quoting *Chissell v. State*, 705 N.E.2d 501, 504 (Ind. Ct. App. 1999), *trans. denied*).

However, we need not consider the exculpatory nature of the blood sample or whether the State acted in bad faith by not preserving it because the State never possessed the blood sample. We examined this issue in *Glasscock v. State*, 576

N.E.2d 600 (Ind. Ct. App. 1991), *reh'g denied*, *trans. denied*.[6] In that case, on November 29, 1989, Glasscock was involved in a motor vehicle accident in which the occupants of the other vehicle died. *Id*. at 602. At the scene of the accident, witnesses "detected an odor of alcohol on Glasscock's breath." *Id*. During Glasscock's emergency room visit immediately after the accident, the attending doctor took samples of Glasscock's blood. *Id*. The results of one of the blood tests indicated Glasscock's blood alcohol content ("BAC") was .196%. *Id*.

[18] Based thereon, the State charged Glasscock with operating a vehicle while intoxicated causing death, reckless homicide, and operating a vehicle with .10% or more BAC resulting in death. *Id*. On February 9, 1990, Glasscock filed a motion for independent blood analysis, which the trial court apparently granted. *Id*. Glasscock attempted to obtain the blood samples and discovered the hospital had destroyed them seven days after they were taken. *Id*. Glasscock then filed a motion to suppress the State's BAC evidence. *Id*. The trial court denied his motion. Id. Following a jury trial, the trial court entered convictions on all counts. *Id*.

[19] On appeal, Glasscock argued the BAC evidence was erroneously admitted because the blood samples taken by the hospital were destroyed before he could

---

[6] We note Westlaw indicates *Glasscock* was disapproved by *Abney v. State*, 821 N.E.2d 375, 378-9 (Ind. 2005). However, the ground for disapproval in *Glasscock* – limiting the application of Indiana Code section 9-11-4-6 (predecessor to Indiana Code section 9-30-6-6(g)) to when a physician refuses to draw a blood sample – is distinct from the portion of *Glasscock* that we rely on herein, which remains good law.

conduct an independent analysis. *Id.* He claimed the State negligently destroyed material evidence and did so in bad faith, and thus his conviction should be overturned. *Id.* However, we noted "the police and the prosecution never possessed the blood samples. Upon Dr. Froderman's own initiative, blood samples were taken and tested. Afterwards, the samples were destroyed in accordance with the hospital's procedure." *Id.* Based thereon, we held: "Where the police and the prosecution did not possess evidence, the rule requiring reversal of a conviction based upon evidence which was negligently destroyed does not apply." *Id.*

[20] The situation here is almost identical. As noted in the facts, emergency room staff at Eskenazi Hospital collected blood and urine samples from Brown shortly after the incident. When Detective Prater obtained a search warrant and went to collect the samples almost three weeks after the incident, he discovered the hospital had destroyed the blood samples. Like in *Glasscock*, the State never possessed the blood samples and, therefore, cannot be held responsible for the destruction of Brown's blood samples. Brown has not demonstrated a violation of his right to due process.

## 2. Urine Sample

[21] Brown next argues the trial court abused its discretion when it admitted the urinalysis results from the sample collected shortly after the shooting because

the results were irrelevant under Indiana Rule of Evidence 401(1)(b)[7] and, even if relevant, the results were unfairly prejudicial under Rule 403.[8] We afford trial courts broad discretion in ruling on the admission of evidence. *Townsend v. State*, 33 N.E.3d 367, 370 (Ind. Ct. App. 2015), *trans. denied*. "Generally, we review the trial court's ruling on the admission of evidence for an abuse of discretion. We reverse only where the decision is clearly against the logic and effect of the facts and circumstances." *Jones v. State*, 982 N.E.2d 417, 421 (Ind. Ct. App. 2013) (internal citation omitted), *trans. denied*.

[22] The State offered the urinalysis evidence in support of its theory that Brown was chemically impaired, rather than having a seizure or other physical brain impairment, at the time that he shot Lieutenant Allan. During trial, Dr. Sheila Arnold with the Indiana State Department of Toxicology testified regarding her review of the urine sample results she received from the laboratory. She explained "[u]rine is an indicator of past usage. It doesn't preclude current usage, but it generally is looked at as showing you what has been in that person's system in hours or days prior." (Tr. Vol. VII at 180.) Therefore, because the urinalysis could not pinpoint a time of usage, the evidence bore

---

[7] Rule 401 states, in relevant part: "Evidence is relevant if: (1) it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . (b) the fact is of consequence in determining the action."

[8] Rule 403 states, in relevant part: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice[.]"

only slight relevance to the issue of whether Brown was intoxicated at the time of the crime.

[23] However, even if the evidence had been irrelevant, we would not reverse unless Brown was prejudiced by the admission. *See* Ind. Appellate Rule 66 (no error requires reversal unless it impacts the substantial rights of a party). When, as here, the court conducts a bench trial, we presume the trial court knows and properly applies the law and considers only evidence properly before the court as the court reaches a decision. *See Conley v. State*, 972 N.E.2d 864, 873 (Ind. 2012). "The risk of prejudice is quelled when the evidence is solely before the trial court." *Id*. An error in the admission of evidence does not require reversal unless it affects the substantial rights of a party. *Stewart v. State*, 754 N.E.2d 492, 496 (Ind. 2001). "The improper admission of evidence is harmless error when the conviction is supported by such substantial independent evidence of guilt as to satisfy the reviewing court that there is no substantial likelihood that the questioned evidence contributed to the conviction." *Barker v. State, 695 N.E.2d 925, 931 (Ind. 1998), reh'g denied*.

[24] Here, any error in the admission of the urinalysis was harmless because there existed substantial independent evidence to support Brown's conviction. First, the trial court's pronouncement of guilt suggested it did not rely on the toxicology report and instead rejected the State's theory that Brown was intoxicated. (*See* Tr. Vol. VIII at 211) ("While the State has argued vigorously its theory of the case with an emphasis on the Defendant's drug use and/or the Defendant's reaction to a potential drug withdrawal, the Court is not required

to accept or even agree with that premise.").  Second, the trial court's pronouncement of guilt addressed in detail – and rejected – the evidence provided by defendant as to his theory of defense, and that rejection was supported by substantial evidence in the record.  Brown was able to answer questions posed by Lieutenant Allan prior to the shooting and Brown provided Lieutenant Allan with his driver's license when requested.  Shortly after Brown gave Lieutenant Allan his driver's license, Brown suddenly yelled "fuck you" and said, "give me the fucking gun." (*Id.* at 1:09 - :11.)

[25]     Regarding Brown's defense theory that he was unable to process the scene of the accident because of a head injury, prior head trauma, or a seizure, the State presented testimony from Dr. Troy Payner, a neurosurgeon from Goodman Campbell Brain and Spine.  Dr. Payner testified his review of Brown's CT scans taken shortly after the incident did not indicate any past trauma.  He noted the CT scan indicated there was "bleeding in the right frontal part of the brain" that was "small, isolated to the right front part." (Tr. Vol. VII at 135-6.)  Dr. Payner testified that in the "thousands" of similar injuries he had seen in his career, he had never observed a patient with that injury be "aggressive or violent" and opined that "head injury patients who are intoxicated may[ ]be thrashing and what not." (*Id.* at 137.)  Dr. Payner testified it was his opinion that Brown's "head injury did not occur as a result of the car accident." (*Id.* at 149.) Regarding the defense's theory that Brown suffered a seizure related to the accident causing him to be unable to understand his actions, Dr. Payner testified someone having a seizure would "make[] repetitive movement[s] . . .

either shaking . . . their arm just shakes, or their lips move in a certain way." (*Id*. at 159.) He stated those actions are "different than someone who is reaching to pick something up specifically, and that's a more directed or volitional movement, including pulling a gun." (*Id*.) Based thereon, Dr. Payner concluded, "I think there is tremendous evidence that he did not have a seizure." (*Id*. at 169.) Because the evidence presented independent of the urinalysis rebutted the defense's theory of the crime, any error in the admission of the urinalysis results was harmless. *See, e.g.*, *Smith v. State*, 190 N.E.3d 462, 466 (Ind. Ct. App. 2022) (even if the admission of evidence may have been error, that error was harmless given the overwhelming evidence of defendant's guilt), *reh'g denied*, *trans. denied*.

## 3. Sufficiency of the Evidence

[26] Brown argues the State did not present sufficient evidence he knowingly or intentionally killed Lieutenant Allan because Brown, who the defense contended was suffering from head trauma and/or a seizure, "was not processing the scene correctly. It is akin to self-defense, though his perception of what was happening was not reality. Jason Brown did not wake up that morning intending to inflict harm on anyone . . . [t]his was out of character for Jason Brown[.]" (Br. of Appellant at 27.) We apply a well-settled standard of review when evaluating claims of insufficient evidence:

> Sufficiency-of-the-evidence claims . . . warrant a deferential standard, in which we neither reweigh the evidence nor judge witness credibility. Rather, we consider only the evidence supporting the judgment and any reasonable inferences drawn

from that evidence. We will affirm a conviction if there is substantial evidence of probative value that would lead a reasonable trier of fact to conclude that the defendant was guilty beyond a reasonable doubt.

*Powell v. State*, 151 N.E.3d 256, 262-63 (Ind. 2020) (internal citations omitted). "The State must prove every element of the crime charged beyond a reasonable doubt." *Willis v. State*, 983 N.E.2d 670, 672 (Ind. Ct. App. 2013).

[27] To prove Brown committed murder, the State had to prove he "knowingly or intentionally" killed Lieutenant Allan. *See* Ind. Code § 35-41-1-1(1). A person engages in behavior knowingly if, "when he engages in the conduct, he is aware of a high probability that he is doing so." Ind. Code § 35-41-2-2(b). A person engages in behavior intentionally if, "when he engages in the conduct, it is his conscious objective to do so." Ind. Code § 35-41-2-2(a). Intent is a mental function, *Laughlin v. State*, 101 N.E.3d 827, 829 (Ind. Ct. App. 2018), and unless a defendant confesses, a trier of fact must infer intent from the circumstances surrounding the act at issue. *Id.* To support a murder conviction, the knowingly mens rea "may be inferred from a defendant's use of a deadly weapon in a manner likely to cause death." *Miles v. State*, 51 N.E.3d 305, 611 (Ind. Ct. App. 2016) (citing *Barker v. State*, 695 N.E.2d 925, 931 (Ind. 1998), *reh'g denied*), *trans. denied*.

[28] As noted *supra* in our analysis of the admission of the urinalysis, the State presented evidence Brown was able to answer questions from and provide his driver's license to Lieutenant Allan prior to the shooting and shortly after the

accident. Additionally, he shouted, attempting to locate his gun, while Lieutenant Allan was in the vehicle rendering aid. Brown shot his gun until it was empty, that is, eighteen shots, ten of which hit Lieutenant Allan. Finally, the State's expert, Dr. Payner, testified that, in his opinion, Brown's behavior was not consistent with someone suffering a seizure and the CT scan taken of Brown shortly after the accident did not indicate the head trauma Brown claimed to have suffered prior to the car accident. Brown's reliance on his expert, Dr. Sheila Arnold, and his alternative interpretation of the evidence is an invitation for us to reweigh the evidence and judge the credibility of witnesses, which we cannot do. *See Powell*, 151 N.E.3d at 262 (appellate court does not reweigh evidence or judge the credibility of witnesses). Based thereon, we conclude the State presented sufficient evidence Brown knowingly and intentionally killed Lieutenant Allan. *See, e.g.*, *Barker v. State*, 695 N.E.2d 925, 931 (Ind. 1998) ("to fire a deadly weapon at point blank range is to be 'aware of a high probability' that death will result") (quoting Ind. Code § 35-41-2-2(b)), *reh'g denied*.

# Conclusion

[29] The State did not violate Brown's due process right to a defense when it did not preserve Brown's blood sample because the State never possessed Brown's blood sample. Further, any error in the admission of Brown's urinalysis was harmless because there existed sufficient evidence outside of the urinalysis to

disprove his defense. Finally, the State presented sufficient evidence to rebut Brown's defense and prove that he committed murder. Accordingly, we affirm.

[30] Affirmed.

Weissmann, J., and Foley, J., concur.